GARRETT, J.
The plaintiffs, Michael H. Wainwright and T. Scott Pernici, filed a defamation suit against the defendants, Ollie Tyler, Mayor of Shreveport, and Brian Crawford, Chief Administrative Officer for Shreveport. The defendants filed a special motion to strike the petition under La. C.C.P. art. 971, which was granted by the trial court. The petition was stricken and the defendants were also awarded attorney fees. The plaintiffs appeal. For the following reasons, we affirm.
FACTS
In order to understand the chain of events leading up to this litigation, some background information gleaned from the record is necessary. The City of Shreveport was made subject to a consent decree requiring it to repair the city water and sewerage infrastructure. The city sought to obtain some funding for the project through the Louisiana State Bond Commission. In connection with this process, a new billing structure was implemented through city ordinances. Pernici, a Shreveport businessman who had previously served on the Architect and Engineer Selection Committee for the city, claimed that in 2015, he could not reconcile his water bill with the new rates set in the ordinance. He contacted Wainwright, a former Shreveport resident who now lives in North Carolina. Wainwright is a lawyer and was a former lobbyist for the city. They claimed that they determined how the billing errors were made and how to correct them. Based upon their experience and other contingency fee contracts the city had routinely awarded in the past, they thought the city would be willing to pay them 25% of the additional revenue gained for the first four years after the billing error was corrected.
The plaintiffs contacted Justin Haydel with Manchac Consulting Group, Inc. ("Manchac"). According to the plaintiffs, Haydel was an expert in municipal water systems and billing, and they sought his expertise to be sure they correctly interpreted the ordinance, identified the billing error, and "identified the likely party responsible for the error."
Manchac sought a meeting with William Bradford, the city attorney. Before informing *209 the city of the billing error, Manchac required that Bradford sign a nondisclosure agreement ("NDA"), which would prevent the city from using any of the information without paying for it. Bradford signed the NDA. The plaintiffs later claimed that they were undisclosed principals to the NDA.[1] Manchac then made a presentation with the information regarding the billing error.
On June 8, 2016, Manchac repeated the presentation, this time to Bradford, Crawford, and Barbara Featherston, Director of the Department of Water and Sewerage. Crawford and Featherston signed the NDA before the presentation. Manchac also presented a Revenue Enhancement Agreement, which included the proposal for payment for information about the billing error and possible future involvement by Manchac with the city water department.
After the presentation, Charles Grubb, a former Shreveport city attorney under several administrations, corresponded with Bradford on behalf of Manchac in an attempt to negotiate payment for the information. In a letter dated July 18, 2016, Grubb indicated that the city had proposed paying 10% of the new revenues derived from correction of the billing error, from February 15, 2015, to July 1, 2016, a period of approximately 18 months. Grubb offered a counterproposal stating that Manchac would be willing to accept two payments of $250,000 each, along with contracts for engineering and consulting work on the sewerage project. The city was given until August 12, 2016, to accept the offer. When it did not do so, the offer was withdrawn.
According to the plaintiffs, after Manchac's presentation, the city immediately used the "privileged" information to correct the underbilling, without permission and without payment. They claim the error was corrected, beginning with the August 2016 water bills.
On August 29, 2016, Wainwright emailed a lengthy, single-spaced letter to Tyler.[2] He stated that he was contacted by "an acquaintance" who thought there was something wrong with the water billing, and they discovered the problem. They then enlisted the aid of Manchac and Grubb, and presented the information to the city. In his letter, Wainwright said:
I researched the ordinance language as well as the motivation for adoption of the new rate structure. I concluded the City was not only in violation of its own ordinance, but that error was resulting in revenue shortfalls that impacted the City's debt servicing of the bond financing used to fund remedial actions to comply with the City's consent order regarding water & sewerage upgrades.
According to Wainwright, correction of the error would result in more than $1.6 million in additional revenue to the city in the next year. Wainwright stated:
At the onset we understandably anticipated that the City would be elated to learn that by correcting its previously unknown error, the City could immediately increase its revenue by tens of thousands of dollars every year for the foreseeable future.... Our expectation was that the City would be only too *210 happy to reasonably compensate us by paying a reasonable percentage of this "new found" money for a limited time period.....
Our original proposal was to give the City the option to either adopt or reject the findings and recommendations. If the City elected to reject, no compensation would be due, but if the City adopted/implemented the recommendations, we would be paid ¼ of the savings or enhanced revenue realized by the City for the initial four year period. Candidly, we felt the City would accept this proposal. It was inconceivable that any entity, including the City would not jump at an opportunity to substantially increase its revenues in exchange for paying a reasonable, time-limited percentage of those revenues....
The letter outlined the difficulties that had been encountered in striking a deal with the city and the belief that the city had used the information to correct the billing error without paying for the information. The letter alluded to "political fallout" that would occur if it became known that high-volume water users were undercharged, while low-volume users were charged the full amount. Wainwright proposed that the city execute an agreement implementing the proposed payment plan in exchange for the retroactive authorization of the right to use the information. Wainwright continued:
Frankly, I am both mystified and shocked by the City's bad faith conduct and it's [sic] blatant, willful violation of the NDA. We came to the City with the expectation of receiving thanks for making it possible for the City to quietly, and discreetly correct a very costly error. Such correction will literally mean millions of new dollars to the City coffers. Instead we have been dismissed, or characterized as adversaries, because we had the audacity to request a reasonable compensation that would be paid out of a portion of the first four years' of new dollars. Remember, we did not create the problem, the City did. And the City did not find the solution, we did. And, absent our bringing the error to the City's attention, these huge loses [sic] would have gone on and on.
Wainwright concluded the letter with the following paragraph:
Absent such an agreement, we will reluctantly accept an adversarial role because it is the only position the City has left us. Unfortunately, fulfilling that role will not be possible without all of this being made public. That in turn, will inevitably draw the attention and interest of those who have been adversely affected by the shortfall in revenue and to others who will find it irresistible for their own political gain. It's hard to believe the City has distorted our good intentions into this.
That same date, Tyler sent an email to Bradford, Crawford, and Featherston, forwarding Wainwright's letter. The email provided as follows
Attorney Bradford:
Please see the attachment in the email below. It appears that we are [being] blackmailed by this company. Please peruse it very carefully with Mr. Crawford and Ms. Featherston. We need to get in front of this situation.
I suggest we think about sharing the information regarding the water billing error with Council members. I don't like being bullied [or] blackmailed. Do you have any other legal advice for me?
Wainwright and Pernici are involved in a business entity called Sand Beach Properties, LLC ("Sand Beach"). In October 2016, Sand Beach filed suit against the city for breach of the NDA. Although that suit *211 is separate from the matter at issue here, which was not filed until March 2017, it also involves the water billing issues.
According to Tyler's affidavit submitted in this suit, Wainwright made a public records request to the city in August 2016 for documents related to the billing error. Tyler's email, set forth above, was included in the documents produced by the city. On October 12, 2016, the Shreveport Times ("Times") published a story outlining the billing error and how it was brought to the attention of city officials, including the demand for payment and the plaintiffs' involvement. In the article, Tyler is quoted as saying that the demand for payment amounted to being "blackmailed." Public records documents were used in writing the story. The record is unclear about how the Times reporter came into possession of the public records documents and the email at that time. In any event, a later article by the same reporter indicates that she got the information from Pernici.
On October 13, 2016, the Times published a video story on its website about the billing controversy. The story showed signatures on the NDAs, internal emails from Featherston, letters between Bradford and Wainwright, and Tyler's email, referred to above. Also included in the video story was an audio interview with Tyler, in which she said:
I stand by my statement that we will not be bullied or blackmailed into a situation where citizens' interests in the funds are possibly being extorted-I'm saying possibly-or, or for personal gain.
On October 14, 2016, the Times printed a response from Tyler to the information in the newspaper article. In her comments, Tyler referenced "outside parties" who brought the billing error to the city's attention and demanded payment for the information. Tyler said, "I have been steadfast in my convictions not to allow the City to be extorted or blackmailed on the backs of the citizens." She also stated:
The fact that most of these outside parties have former ties or employment with the City gave me grave concern about the true source of this discovery and the motivation behind their efforts. I have been very transparent throughout my administration and will continue to do so. Consequently, we are providing all documentation and information related to this matter to the Department of Justice for its review.
She further said that, because the city refused to give in to the demands of "outside parties," they provided misleading information to the State Bond Commission which could impede the city's ability to meet the mandates of the consent decree. Reports about the billing controversy were also carried on other media and news outlets.
On or about October 14, 2016, Crawford was interviewed on KEEL radio about the dispute. He referred to an individual "who does not live in our state" who wrote a letter saying he discovered the billing error and wanted money and, if he didn't get money, he would make the error public. Crawford termed this "kind of like a shakedown thing." He then noted that the city learned from the newspaper article that a local businessman said he was the person who discovered the error and wanted to be paid. He said they brought in the Justice Department, which brought in the FBI, stating that it was "hard to fathom that just the random citizen out there would have stumbled across this information and we're trying to determine who inside the City had access to this information[.]" He also said that those involved had contacted the State Bond Commission in an attempt to derail some of the city's bond funding.
*212 On March 2, 2017, the plaintiffs filed the present defamation suit against Tyler and Crawford. They claimed they were private citizens who had been defamed by the defendants. They cited Tyler's response to the Times print article, as well as the interview published on the Times website. The plaintiffs pointed out the numerous times that Tyler's statements about blackmail and extortion were repeated by various media outlets. They cited the statements made by Crawford in his KEEL radio interview. The plaintiffs alleged that the use of the words "blackmail, extortion, holding the city hostage, bullying, and shakedown" were "purposely designed and calculated to produce harm and create the negative impression" those words would "naturally engender in the minds of average persons."
They also alleged that the use of those words, coupled with references to the Department of Justice, carried the inference that Wainwright and Pernici engaged in criminal activity and this constituted defamation per se .
The defendants filed an answer and a special motion to strike the petition and to recover attorney fees under La. C.C.P. art. 971, Louisiana's anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute. They argued that, in the instant controversy, the plaintiffs are limited purpose public figures complaining of comments regarding matters of public concern. They contended that their comments on such public figures' activities, involving a matter of public concern, were protected speech. Further, under La. C.C.P. art. 971, once it was shown that comments were made on an issue of public concern involving limited purpose public figures, the burden shifted to the plaintiffs to show a probability of success on their defamation claims. Because the plaintiffs were limited purpose public figures, the defendants contended that the plaintiffs had to show that the statements were made with actual malice. Since the plaintiffs could not meet this burden of proof, the defendants urged that the motion to strike be granted, the plaintiffs' petition be dismissed with prejudice, and attorney fees be awarded to them.
Attached to the motion were affidavits from Tyler and Crawford. Tyler said that, in July 2016, Crawford, Bradford, and Featherston informed her of the billing error and that the information was revealed to them in a meeting with Manchac and Grubb. She instructed that the error be corrected to insure compliance with the city's ordinance. She was told of the demands for payment from Manchac and did not know that Wainwright and Pernici were involved. Tyler averred that on August 22, 2016, the city received a public records request from Wainwright seeking records regarding water rates and billing from June through August 2016. Wainwright's letter to her was received on August 29, 2016, and she took it as a threat. When the city refused to pay, it was contacted by a Times reporter who said she had documents from the public records request which included Tyler's email. In talking with the reporter, Tyler said she expressed her opinion that the actions of the outside parties possibly amounted to extortion or blackmail. Tyler said she first learned of Pernici's involvement through the Times article.
Before the newspaper article was published, Bradford told Tyler that the director of the Louisiana State Bond Commission called the city and said it had been contacted regarding the water billing issue. Tyler thought it was a reasonable inference that the outside parties contacted the State Bond Commission. At the time of her comments, she harbored no ill will toward Wainwright and Pernici and never used their names in any comments *213 to the press. Tyler stated that all comments were based upon her understanding of the facts and she had no actual awareness that any statements were false.
Crawford's affidavit was substantially similar to Tyler's. In speaking about Wainwright and Pernici, Crawford stated that both individuals had previously been heavily involved in government activities. He had been told that Pernici was connected with the water department's meter reading services during the administration of a former mayor, Keith Hightower. Crawford knew that Wainwright had business relationships with Hightower and Pernici.
Regarding the present controversy, Crawford said in his affidavit:
During our investigation of this matter, and before any media coverage or publicity concerning the tiered water rate billing error, I became aware that several city employees in the Water and Sewerage Department Billing Office were aware in 2015 that the Ordinance was not being applied correctly, and had notified the third party billing software company (Systems and Software), but had not reported that to their supervisor. Based on this and my understanding of the billing error, when weighing the plausibility of a random citizen discovering the complex error through the monitoring of friends' water bills or whether individuals within the City, who we now knew had actual knowledge and intimate details of the error and who could have possibly been involved in its disclosure (intentionally or unintentionally) to the City's detriment and other's gain, it gave me great concern that the City had been set up and laws may have been broken. Also, Manchac's representative had given me an altered and different version of how the error was discovered, outright claiming they had found the error because they were an engineering firm and had the capability to do so based on their subject matter expertise and history of making similar analysis [sic] in other municipalities. This we now know was deceptive and an untruth. Based on the culmination of these details, and the increasing number of parties that appeared to be involved in the matter, including former and current City personnel or those with previous affiliations or associations to the City, the only way it could be properly investigated would be to go through outside enforcement agencies. My statements regarding these agencies in no way referred to any one individual or organization but to the entirety of the multifaceted matter as a whole.
The plainitffs filed a lengthy opposition to the motion to strike which included affidavits from the two plaintiffs. Wainwright's affidavit provided:
I have never proposed, suggested, requested, or demanded that the City or Mayor Tyler or CAO Crawford or Water Department Director Featherston or City Attorney Bradford pay anyone, including but not limited to, Manchac Consulting Group, Inc., Justin Haydel, Charles Grubb, Scott Pernici, or me, any sum of money outside of my requests to Mayor Tyler and City Attorney Bradford, contained in my letters, that the City agree to pay just compensation to the disclosing parties for the valuable information that enabled the City to substantially increase its revenues.
Wainwright also stated the following:
Neither I, nor anyone acting on my behalf, ever phoned or otherwise communicated with any one [sic] at the Louisiana State Bond Commission at any time other than a Public Records Request I made of an after-the-fact listing of attorneys who were paid for work relating to the latest bond issuance *214 made to finance water & sewerage infrastructure.
Wainwright claimed that he never initiated or attempted to schedule a press conference on this matter. He maintained that his contact with the media had been at the initiation of the media.
Pernici executed an affidavit in which he said he never negotiated with the city for payment for any Revenue Enhancement Agreement, he never called a press conference or sought publicity for himself in connection with the water tier litigation, and he denied initiating contact with media sources. Pernici said that he only responded to "perhaps half a dozen" press inquiries on this matter. He also denied contacting the State Bond Commission at any time other than a public records request made with his knowledge by Wainwright for a list of attorneys who were paid for work relating to the bond issue to finance the water and sewerage infrastructure. In addition to the affidavits, a plethora of documents was also filed. The defendants' reply was accompanied by the filing of additional documents.
The motion was argued on May 2, 2017. The court found that La. C.C.P. art. 971 applied to this matter, the speech at issue dealt with matters of public concern, and the statements were made in furtherance of the defendants' right to free speech in connection with a public issue. The trial court reasoned that the statements were subjective opinion and the plaintiffs failed to prove the probability of success on their defamation claim. The trial court signed a judgment granting the defendants' motion to strike and ordering the plaintiffs to pay attorney fees to the defendants in the amount of $18,832.70. On appeal, the plaintiffs claim that the trial court erred in finding that the plaintiffs did not prove the probability of success on the merits of their defamation claim and in finding that La. C.C.P. art. 971 applied to the present case because such a finding is contrary to the legislative purpose and spirit of the statute.
DEFAMATION CLAIM
The plaintiffs contend that the trial court erred in granting the defendants' motion, based upon a finding that they did not prove the probability of success on the merits of their defamation claim. They maintain that the statements made by the defendants were defamatory per se and were not opinion. They assert that the defendants made false statements capable of a defamatory meaning, the statements were published, and they were negligently made with reckless disregard for the truth. They also claim they can prove they were injured by the statements. These arguments are without merit.
Legal Principles
The right to free speech is guaranteed in the constitutions of both the United States and Louisiana. The First Amendment to the United States Constitution provides in pertinent part:
Congress shall make no law ... abridging the freedom of speech, or of the press [.]
The Louisiana Constitution Art. 1, § 7, states:
No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.
The United States Supreme Court has held that not all speech is of equal First Amendment importance. It is speech on matters of public concern that is at the heart of the First Amendment's protection. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc. , 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed. 2d 593 (1985). Matters of *215 public concern relate to any matter of political, social, or other concern to the community. Connick v. Myers , 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed. 2d 708 (1983). Whether speech addresses matters of public concern must be determined by the content, form, and context of a given statement, as revealed by the entire record. See Kennedy v. Sheriff of E. Baton Rouge , 2005-1418 (La. 7/10/06), 935 So.2d 669 ; Hakim v. O'Donnell , 49,140 (La. App. 2 Cir. 6/25/14), 144 So.3d 1179, writ denied , 2014-1501 (La. 11/7/14), 152 So.3d 175, cert . denied , --- U.S. ----, 135 S.Ct. 1714, 191 L.Ed. 2d 678 (2015) ; Quinlan v. Sugar-Gold , 51,191 (La. App. 2 Cir. 4/5/17), 219 So.3d 1173.
Abuses of the right to free speech are actionable under Louisiana law. Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. Sassone v. Elder , 626 So.2d 345 (La. 1993) ; Trentecosta v. Beck , 96-2388 (La. 10/21/97), 703 So.2d 552. A communication is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community or to deter others from associating or dealing with the person or otherwise exposes the person to contempt or ridicule. Trentecosta v. Beck , supra .See Kennedy v. Sheriff of E. Baton Rouge , supra ; Hakim v. O'Donnell , supra .
A cause of action for defamation arises out of a violation of La. C.C. art. 2315. Fitzgerald v. Tucker , 1998-2313 (La. 6/29/99), 737 So.2d 706 ; Hakim v. O'Donnell , supra . Four elements are necessary to establish a claim for defamation: (1) a false or defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Kennedy v. Sheriff of E. Baton Rouge , supra ; Costello v. Hardy , 2003-1146 (La. 1/21/04), 864 So.2d 129 ; Trentecosta v. Beck , supra ; Hakim v. O'Donnell , supra . If even one of the required elements of the tort is lacking, the cause of action fails.[3] Quinlan v. Sugar-Gold , supra .
The fault requirement is often set forth in the jurisprudence as malice, actual or implied. Costello v. Hardy , supra ; Hakim v. O'Donnell , supra . Actual malice is generally established by showing that the defendant either knew that the statement was false or acted with reckless disregard for the truth. See Costello v. Hardy , supra ;
*216 Stabiler v. Louisiana Bus., Inc. , 2016-1182 (La. App. 1 Cir. 9/26/17), 232 So.3d 555, writ denied , 2017-1824 (La. 12/15/17), 231 So.3d 639.
The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court. The question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. Cooksey v. Stewart , 41,336 (La. App. 2 Cir. 8/23/06), 938 So.2d 1206, writ denied , 2006-2348 (La. 12/8/06), 943 So.2d 1087.
Louisiana's "anti-SLAPP" statute, La. C.C.P. art. 971, provides in pertinent part:
A. (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.
(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
(3) If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding.
B. In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs
.....
F. As used in this Article, the following terms shall have the meanings ascribed to them below, unless the context clearly indicates otherwise:
(1) "Act in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue" includes but is not limited to:
....
(c) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.
(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.
This statute was enacted by the legislature as a procedural device to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. Johnson v. KTBS, Inc. , 39,022 (La. App. 2 Cir. 11/23/04), 889 So.2d 329, writ denied , 2004-3192 (La. 3/11/05), 896 So.2d 68.
The legislature expressly stated its intent behind La. C.C.P. art. 971 :
The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and this participation should not be chilled through abuse of judicial process. To this end, it is the intention of the legislature that the Article enacted pursuant to this Act shall be construed broadly.
*217 1999 La. Acts 734, § 2. See also Shelton v. Pavon , 2017-0482 (La. 10/18/17), 236 So.3d 1233.
Our appellate courts interpret this statute as requiring a two-part, burden-shifting analysis. Shelton v. Pavon , supra ; Thomas v. City of Monroe, La. , 36,526 (La. App. 2 Cir. 12/18/02), 833 So.2d 1282 ; Aymond v. Dupree , 05-1248 (La. App. 3 Cir. 4/12/06), 928 So.2d 721, writ denied , 2006-1729 (La. 10/6/06), 938 So.2d 85. In cases where right of petition and free speech activities form the basis of the claims, the mover must first establish that the cause of action against him arises from an act by him in the exercise of his right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue. La. C.C.P. art. 971(A)(1) ; Shelton v. Pavon , supra ; Yount v. Handshoe , 14-919 (La. App. 5 Cir. 5/28/15), 171 So.3d 381 ; Thinkstream, Inc. v. Rubin , 06-1595 (La. App. 1 Cir. 9/26/07), 971 So.2d 1092, writ denied , 2007-2113 (La. 1/7/08), 973 So.2d 730. If the mover makes a prima facie showing that his comments were constitutionally protected and in connection with a public issue, the burden shifts to the plaintiff to demonstrate a probability of success on the claim. In cases where more than one claim is alleged in the petition, the courts examine the probability of success of each claim individually. If the plaintiff can demonstrate a probability of success on any of his claims, then the special motion to strike must fail. Shelton v. Pavon , supra .See also Breen v. Holmes , 2016-1591 (La. App. 1 Cir. 12/7/17), 236 So.3d 632.
The granting of a special motion to strike presents a question of law. Questions of law are reviewed de novo , with the judgment rendered on the record, without deference to the legal conclusions of the tribunals below. Quinlan v. Sugar-Gold , supra .
Discussion
Because we review this matter de novo , we will examine the record and discuss whether the defendants' motion under La. C.C.P. art. 971 should have been granted.[4] First, we must determine whether the statements made by the defendants fall under the protection of La. C.C.P. art. 971.
The plaintiffs complain of the statements by Tyler using the words "blackmail" and "extortion" in the initial newspaper article and the subsequent interviews and statements made by Tyler in response to that article. They also complain of statements by Tyler regarding turning the matter over the Department of Justice for investigation and stating that the plaintiffs contacted the State Bond Commission regarding the billing error.
The plaintiffs complain of statements made by Crawford in his radio interview, outlined above, which termed the plaintiffs' actions a "shakedown" and which also stated the belief that "those involved" had contacted the State Bond Commission in an effort to derail some of the city's bond funding. Crawford also said that there were concerns regarding whether individuals inside city government had information regarding the billing error, and the city *218 contacted the Justice Department, which brought in the FBI.
Clearly, the water billing error was a matter of public concern or interest affecting all residents obtaining water from the city. The defendants' comments, made in response to the publication of information concerning the water billing error, qualified as "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." The statements met the statutory definition of acts in furtherance of the right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue and fall under the purview of La. C.C.P. art. 971. Therefore, the defendants have made a prima facie showing that the statements were constitutionally protected and were made in connection with a public issue. The burden now shifts to the plaintiffs to demonstrate a probability of success on their defamation claims.
According to the plaintiffs, because blackmail and extortion are crimes, accusing the plaintiffs of those crimes was defamation per se. They claim that the defendants, in effect, told the public that a criminal complaint and investigation against the plaintiffs had been referred to the Department of Justice. The plaintiffs claim they were "unambiguously and blatantly" accused of a crime.
Defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se. When a plaintiff proves publication of words that are defamatory per se , falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Injury may also be presumed. When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, falsity, malice (or fault), and injury. Kennedy v. Sheriff of E. Baton Rouge , supra ; Costello v. Hardy , supra ; Hakim v. O'Donnell , supra .
The intent and meaning of an alleged defamatory statement must be gathered, not only from the words alleged to be defamatory, but from the context as well. The true meaning must be ascertained from a consideration of all parts of the statement, as well as the circumstances of its publication. The test is the effect it is fairly calculated to produce and the impression it would naturally engender in the minds of the average persons by whom it is heard. Autry v. Woodall , 493 So.2d 716 (La. App. 2d Cir. 1986) ; Taylor v. Town of Arcadia , 519 So.2d 303 (La. App. 2 Cir. 1988), writ denied , 522 So.2d 1097 (La. 1988).
The record fails to show that the plaintiffs carried their burden of showing success on the claim that the defendants committed defamation per se . In the statements to the press, Tyler and Crawford never used the plaintiffs' names in connection with the words "extortion" or "blackmail." Further, the defendants never said that the activities of the plaintiffs were referred to the Department of Justice or the FBI for criminal investigation. Both defendants said they were concerned about how the billing error actually came to light and whether individuals inside city government were responsible for giving information to others about the billing error in exchange for monetary gain. As stated in Crawford's affidavit, he became aware that several city employees in the water and sewerage billing office knew in *219 2015 that the billing ordinance was not being applied correctly and they contacted the billing software company, but did not contact their supervisor. It is clear from the statements of both Tyler and Crawford that this possible leak of information by those inside city government was the matter referred to the Department of Justice and the FBI for investigation. Contrary to the plaintiffs' arguments, the defendants never said that a criminal complaint and investigation against the plaintiffs had been referred to the Department of Justice. As city officials, the defendants did not act inappropriately in investigating this matter and in informing the public of the existence of the investigation when the billing error became public.
The analysis of whether the statements concerning "extortion" and "blackmail" were defamatory per se is closely linked with whether the words were statements of subjective opinion, rather than an unambiguous and blatant accusation of a crime. Speech on matters of public concern enjoys enhanced constitutional protection. See Romero v. Thomson Newspapers (Wisconsin), Inc. , 94-1105 (La. 1/17/95), 648 So.2d 866, cert. denied , 515 U.S. 1131, 115 S.Ct. 2556, 132 L.Ed. 2d 810 (1995) ; Breen v. Holmes , supra . An expression of opinion on a matter of public concern which does not imply a false fact cannot be the basis of a defamation action. Romero v. Thomson Newspapers (Wisconsin), Inc. , supra ; Mashburn v. Collin , 355 So.2d 879 (La. 1977) ; Milkovich v. Lorain Journal Co. , 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed. 2d 1 (1990) ; Breen v. Holmes , supra .See also Bussie v. Lowenthal , 535 So.2d 378 (La. 1988). This is because a statement of opinion based totally on the speaker's subjective view, without expressly stating or implying the existence of underlying facts, is a purely subjective statement that can be neither true nor false. The constitutional protection for statements of opinion applies in all cases, regardless of whether the plaintiff is a public figure. Bussie v. Lowenthal , supra ; Mashburn v. Collin , supra ; Breen v. Holmes , supra; Cooksey v. Stewart , supra .
If a statement expresses an opinion, a defamatory action must fail, unless the opinion implies a false and libelous fact and the opinion was expressed with actual malice. Bussie v. Lowenthal , supra . Where a statement of opinion on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth. Milkovich v. Lorain Journal Co. , supra .
An expression of opinion occurs when the maker of the comment states the facts on which his opinion of the plaintiff is based and then expresses a comment as to the plaintiff's conduct, qualifications or character; or when both parties to the communication know the facts or assume their existence and the comment is clearly based on the known or assumed facts in order to justify the comment. Criticism is privileged as fair comment only when the facts on which it is based are truly stated or privileged or otherwise known either because the facts are common knowledge or readily accessible. Mashburn v. Collin , supra .See also Bussie v. Lowenthal , supra ; Cooksey v. Stewart , supra . Falsity is an indispensable element of any defamation claim, and a purely subjective statement can be neither true nor false. The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the speaker did not intend to assert another objective fact, but only his personal comment on the facts which he had stated. The crucial difference between a statement of fact and *220 opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact. Cooksey v. Stewart , supra.
Several cases in the jurisprudence have considered whether statements including words such as "blackmail" and "extortion" were defamatory. In Greenbelt Co-op. Pub. Ass'n v. Bresler , 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed. 2d 6 (1970), where there were negotiations between a land developer and the city, the media reported that some individuals present at a public meeting on the issue characterized the developer's negotiating position as "blackmail." The developer filed a suit for libel. The Supreme Court said that the statements were not libel in the context used. The Court stated:
It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense.
See also Sassone v. Elder , supra ; Becnel v. Boudreaux , 340 So.2d 687 (La. App. 4 Cir. 1976), writ denied , 342 So.2d 671 (La. 1977).
The plaintiffs argue that the defendants' statements were not opinion, but were "part of the initial report of the dispute to the public." We note that there is no showing in the record that the city was initially responsible for causing this dispute to be reported in the local news media. Instead, the record is clear that they were responding to matters that had been reported by others. Tyler's email statement which first used the words "blackmail" and "extorted" was made in a private email to city employees, after receiving the lengthy letter from Wainwright.[5] According to the undisputed statement in Tyler's affidavit, the information used by the Times in its initial news article on this issue, including Tyler's internal email, was placed in the hands of the plaintiffs following the public records request by Wainwright. The initial news reports set forth the facts regarding how the billing error was presented to the city and the demand for payment for the information. The statements of Tyler and Crawford, after the email and after the initial report of the billing error in the Times, were made in response to the news article. The use of the words "blackmail," "extorted," and "shakedown" were the expression *221 of opinions by Tyler and Crawford regarding the events initiated by the plaintiffs and were based upon the facts reported in the media. Contrary to the plaintiffs' arguments, these statements were fair comment on the demands of the plaintiffs and were similar to the rhetorical hyperbole regarding a negotiating position discussed in Greenbelt Co-op. Pub. Ass'n v. Bresler , supra . Also, as in Becnel v. Boudreaux , supra , the statements were an expression of opinion that the city was being pressured or intimidated.[6] Based upon the context in which the words were used, they were an expression of subjective opinion and were not accusations that the plaintiffs had committed crimes. Further, there is no showing that the comments were based upon false information or that they were made with knowledge of their false implications or with reckless disregard of their truth. The plaintiffs have failed to show the probability of success in proving that the statements were defamatory per se .
Even if the statements complained of were not defamatory per se , the plaintiffs urge that they were susceptible of a defamatory meaning. To determine the applicable standard to be applied, we must determine whether the plaintiffs are private individuals, public figures, or limited purpose public figures.
The court in Kennedy v. Sheriff of E. Baton Rouge , supra , observed that, in determining the standard of liability in defamation claims, the Supreme Court makes a distinction between plaintiffs who are public officials or figures and private individuals. The case of New York Times Co. v. Sullivan , 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964), imposed a high standard on public officials who seek to recover for defamation. In the context of public officials and official conduct, the Supreme Court observed that erroneous statement is inevitable in free debate, and it must be protected if the freedoms of expression are to have the breathing space they need to survive. The Supreme Court held that a public official cannot recover damages for a defamatory falsehood published in relation to official conduct unless he proves actual malice, that is, a statement made with knowledge that it was false or with reckless disregard of whether the statement was false or not. Actual malice must be proven with convincing clarity. Kennedy v. Sheriff of E. Baton Rouge , supra ; Hakim v. O'Donnell , supra . Investigatory failures alone are insufficient to satisfy this standard. New York Times Co. v. Sullivan , supra ; Curtis Pub. Co. v. Butts , 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed. 2d 1094 (1967).
The case of Curtis Pub. Co. v. Butts , supra , extended the standard of liability outlined in New York Times to public figures. That term is defined as non-public officials who are intimately involved in the resolution of important public questions or who, by reason of their fame, shape events in areas of concern to society at large. The Supreme Court later recognized the concept of a limited purpose public figure. See Gertz v. Robert Welch, Inc. , 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed. 2d 789 (1974) ; Hakim v. O'Donnell , supra . An individual who voluntarily injects himself or is drawn into a particular controversy becomes a public figure for this limited range of issues. Such persons invite attention and comment and assume special prominence in the resolution of public questions. Gertz v. Robert Welch, Inc. , supra.
*222 Wainwright had been an attorney in Shreveport, executive assistant to a former Shreveport commissioner of public works, and general counsel for the Caddo Parish Communications District # 1, and had been involved in the campaigns of candidates for mayor of Shreveport. He had investigated and written a guest column in the Times concerning alleged campaign finance irregularities by a former city mayoral candidate. He was a former lobbyist for Shreveport in the state legislature. He had also served on the city port commission and ran unsuccessfully for Shreveport City Council. Pernici was a local businessman with many local business interests and had previously served on the city Architect and Engineer Selection Committee, and had ties to the administration of a former mayor. By virtue of their involvement in the city government and their activities in this case, requesting payment for information regarding a city water billing error and participation in the subsequent media coverage, the plaintiffs either voluntarily interjected themselves or were drawn into this controversy. Therefore, they are limited purpose public figures regarding the issues involved in this matter. In order to show a probability of success on their defamation claim, the plaintiffs were required to prove that defamatory statements were made with actual malice, that is, knowledge that the statements were false or made with reckless disregard of whether the statements were false or not, and actual malice must be proven with convincing clarity.
As discussed above, the statements using the words "extorted" and "blackmail" were expressions of opinion on matters that had been set forth in the public and were not accusations of criminal activity. Further, as set forth above, the defendants never said that the plaintiffs were being investigated by the Department of Justice or the FBI.[7]
As for the statements that the plaintiffs contacted the State Bond Commission regarding the billing error in an attempt to harm the city's ability to obtain funding, the plaintiffs failed to show that these statements were made with actual malice, that is, knowing that they were false or with reckless disregard for the truth. The record shows that, in his letter to Tyler, Wainwright stated that the billing error resulted in revenue shortfalls that impacted the city's debt servicing of the bond financing used to fund remedial actions to comply with the city's consent decree regarding water and sewerage upgrades. Later in his letter he stated that acceptance by the plaintiffs of an adversarial position would require the billing error to be made public and "will inevitably draw the attention and interest of those who have been adversely affected by the shortfall in revenue." According to the defendants, at approximately the same time Wainwright made demands for payment for the information regarding the billing error, and shortly before the article about this matter appeared in the Times, the city was contacted by the State Bond Commission, which had been informed of the error. Whether accurate or not, it was a reasonable inference that the plaintiffs were involved in conveying the information to the State Bond Commission and the statements *223 were not made knowing them to be false or with reckless disregard for the truth. Further, the plaintiffs have failed to show that they were injured by any discussions of contact with the State Bond Commission. The plaintiffs have not shown the probability of success in establishing that these statements were defamatory.
After evaluating all the statements complained of by the plaintiffs, in the context in which they were made, and applying the applicable law on defamation, the plaintiffs have failed to carry their burden of showing a probability of success on their claims. The motion to strike was properly granted by the court below.
APPLICABILITY OF LA. C.C.P. ART. 971
The plaintiffs argue that the trial court erred in finding that La. C.C.P. art. 971 applies to this matter. They claim the statute was enacted to protect private citizens against the chilling effect of large, influential entities or groups who bring frivolous, prolonged litigation to stifle freedom of speech or petition. They maintain that allowing public figures to use the statute against private citizens perverts the purpose of the statute. This argument is without merit.
Discussion
The plaintiffs have cited no authority from this state to support their argument that Louisiana's anti-SLAPP statute cannot be used by governmental officials or entities to defeat meritless claims that would suppress their exercise of free speech and the right to petition. They argue that California, which has a similar anti-SLAPP statute to Louisiana's, has enacted remedial legislation to address a "disturbing abuse" of the anti-SLAPP statute. The plaintiffs candidly note in their brief that Louisiana has not enacted such provisions and instead "has enacted special interest provisions making it easier for special interests to abuse the law."
The plaintiffs cite Cal. C.C.P. § 425.17 as legislation limiting the abuses of anti-SLAPP motions. The California provision prohibits the use of anti-SLAPP motions in public interest lawsuits and suits involving commercial speech when certain enumerated conditions are met. The California statute has no application in the present matter and does not support the plaintiffs' argument that La. C.C.P. art. 971 should not be used by public figures and applied in this case.[8]
Our jurisprudence contains several examples of the use of La. C.C.P. art. 971 by governmental or public entities or public officials. See Williams v. New Orleans Ernest N. Morial Convention Ctr. , 2012-1201 (La. 9/21/12), 98 So.3d 299, cert. denied , 569 U.S. 963, 133 S.Ct. 2033, 185 L.Ed. 2d 896 (2012) ; Ruffino v. Tangipahoa Par. Council , 2006-2073 (La. App. 1 Cir. 6/8/07), 965 So.2d 414 ; Lamz v. Wells , 2005-1497 (La. App. 1 Cir. 6/9/06), 938 So.2d 792 ; Hunt v. Town of New Llano , 2005-1434 (La. App. 3 Cir. 5/3/06), 930 So.2d 251, writ denied , 2006-1852 (La. 10/27/06), 939 So.2d 1283 ; Kirksey v. New Orleans Jazz & Heritage Found., Inc. , 2012-1351 (La. App. 4 Cir. 2/27/13), 116 So.3d 664, writ denied , 2013-0686 (La. 5/3/13), 113 So.3d 216 ; Lee v. Pennington , 2002-0381 (La. App. 4 Cir. 10/16/02), So.2d 1037, writ denied , 2002-2790 (La. 1/24/03), 836 So.2d 52. Accordingly, *224 we reject the plaintiffs' argument that La. C.C.P. art. 971 should not be applied to the present case.
CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court applying La. C.C.P. art. 971 to this matter, granting the motion to strike in favor of the defendants, Ollie Tyler and Brian Crawford, and ordering the plaintiffs, Michael H. Wainwright and T. Scott Pernici, to pay attorney fees to the defendants. Costs in this court are assessed to the plaintiffs.
AFFIRMED.
Attachment
MICHAEL H. WAINWRIGHT ATTORNEY AT LAW August 29, 2016 Honorable Ollie Tyler Mayor City of Shreveport 505 Travis Street Shreveport, LA 71101 Email; mayor@shreveportla.gov CONFIDENTIAL INFORMATION
Dear Mayor Tyler:
First, some background:
Before my wife and I moved to Western North Carolina three years ago, I lived in Shreveport for over fifty years, less my time in college, law school and the three years I worked on Capitol Hill as Asst. Majority Counsel of the House of Representatives Rules Committee under the sponsorship of Congressman Gillis W. Long. Consequently, Shreveport is a city I hold dear.
My relocation preceded your election, but I knew a great deal about you through some mutual acquaintances: the late Bob Munson, who I first met when I was Campaign Manager for Dr. C. O. Simpkins and hired Bob to handle media; Mary Rounds, who was my adopted daughter, Brandy Anderson's high school teacher and mentor; and Henry Price, who was my wife, Marty's supervisor during much of her 30 years as an Art Teacher in the Caddo Parish School System.
I've had a lifelong affinity for politics and government. I had been Co-manager of the Simpkins' mayoral campaign and Manager of Simpkins' campaigns for the Louisiana House of Representatives and for the Louisiana Senate. When Keith decided to run for Mayor, I was an integral part of a small group that went all out for his election. After winning, Keith *225 asked me to be the City's lobbyist at the state legislature. At the time I was already serving as one of Mayor Bo Williams' City Port Commission appointees. Those two positions gave me a wonderful, treasured opportunity to see the inner workings of local government.
Through those experiences and my time on Capitol Hill, I developed an understanding of much of the minutia of the governmental process. From that understanding an attraction to those details became habit-forming. It was out of habit that I first delved into the campaign finance and House of Representative expense reports of Patrick Williams that gave rise to my guest column in the Shreveport Times about his double-dipping. While many of my friends were actively supporting Williams' mayoral campaign, I simply felt the public had a right to know what Representative Williams had been doing with public dollars.
And with that background, let me now continue:
That same Inquisitiveness fueled further investigation when I discovered that some water bills did not jive with a reading of the newly enacted water-tier ordinance that the City Council had enacted. A month or so after Shreveport's new tier rate structure for residential water usage was enacted I was contacted by an acquaintance who advised me that there was something wrong with the way that the City was billing under its new ordinance. We could not reconcile his consumption rate with the tier structure. Additionally, we compared other friends' billings and they too were not reconcilable.
After many hours and days of trying to figure out what the City was doing, we were finally able to decode the formula that the City was using. That formula did not conform to the City's ordinance and the mistake was causing the City to significantly undercharge many residential consumers.
I researched the ordinance language as well as the motivation for adoption of the new rate structure. I concluded that the City was not only in violation of its own ordinance, but that error was resulting in revenue shortfalls that impacted the City's debt servicing of the bond financing *226 used to fund remedial actions to comply with the City's consent order regarding water & sewerage upgrades.
This brought me to conclude that it was important that the City be made aware of the situation. Realizing that it was a matter that should be handled delicately in a face-to-face setting and that a trip to Shreveport presented personal challenges,[1] I began to consider recruiting others to carry the message.
At this point, I decided to discuss this matter with Justin Haydel of Manchac Consulting Group, Inc. because of his extensive expertise in water systems. I was also aware of his extensive involvement with Bossier City, which meant he would frequently be in Shreveport/Bossier. Likewise, I knew that if necessary he had in house talent that could make whatever corrections might be necessary. I had known Justin from the time I was the City's lobbyist at the legislature and through being a City appointee to the Port of Caddo-Bossier where I had served as a Commissioner.
Next, I determined I would ask Charles Grubb to review our findings and to recommend how to best approach the City. Charles was an obvious and easy choice because I had worked with him in the past and his knowledge of City government is unsurpassed by anyone in Northwest Louisiana. Charles was Shreveport's City Attorney under three different Mayors and served as Parish Attorney for the Caddo Commission. He has over forty (40) years of Louisiana Municipal Government experience.
After Justin signed a Non-Disclosure Agreement with me and entered agreements with Charles and me, Manchac was provided with the Confidential information relating to the City's misapplication of the water tier ordinance. With that information Justin was able to estimate the fiscal impact of the City's error.
*227 Armed with this knowledge and illustrative charts I provided, Manchac prepared a powerpoint presentation showing what the City was doing versus what the ordinance provided for. The presentation showed an estimation of $1.6 plus million of additional revenue the City would garner in each coming year if the error was corrected.
At the onset we understandably anticipated that the City would be elated to learn that by correcting Its previously unknown error, the City could immediately increase its revenue by tens of thousand dollars each month and by a million plus of dollars every year for the foreseeable future. Providing this valuable information might not be something one brags about, but we had anticipated expressions of gratitude and thanks. Our expectation was that the City would be only too happy to reasonably compensate us by paying a reasonable percentage of this "new found" money for a limited time period. After all, each of your staff obviously has an expectation of being compensated for their valuable service to the City. We should expect no less for the value we have brought to the City. This new revenue alone will be substantially more than enough to cover all of your administrative staff salaries and benefits each year.
Recognizing that you had tremendous demands on your time, we decided that Charles would be the most credible and knowledgeable individual to approach his friend, City Attorney William Bradford. Charles revealed to Mr. Bradford that he had an unnamed client who had information that if acted on would mean either substantial savings or enhanced revenue to the City. Further, as Charles represented, these substantial savings or enhanced revenues were available without any reduction in workforce, passage of any new ordinances or imposition of any new taxes or fees.
Our original proposal to the City was to give the City the option to either adopt or reject the findings and recommendations. If the City elected to reject, no compensation would be due, but if the City adopted/implemented the recommendations, we would be paid ¼ of the savings or enhanced revenue realized by the City for the initial four year period. Candidly, we felt the City would accept this proposal. it was inconceivable that any entity, including the City, would not jump at an *228 opportunity to substantially increase its annual revenues in exchange for paying a reasonable, time-limited percentage of those new revenues. To us it was analogous to offering to hand someone new found dollars in exchange for that someone paying the finder a quarter, except here the dollars would keep coming in long after the quarters ceased to be paid.
After several days, Mr. Bradford indicated that the City was unwilling to move forward unless a sufficient disclosure of the findings was made to the City in order to determine if it was going to enter any contract.
So reluctantly, but in order to accommodate the City's position, a Non-Disclosure Agreement (NDA) was prepared by Charles and me. That NDA was given to City Attorney Bradford who then executed the NDA on behalf of the City. That NDA contains a clear prohibition against disclosure or use of the Confidential information that was and remains proprietary information. It further provides for injunctive relief and for penalties equal to the greater of $10,000 for each violation or 25% of the entire, on-going, enhanced revenue that the City realizes from its violation of the NDA. This NDA was necessary in order to give the City the preview the City was requiring. The stringent penalties were to protect against the unauthorized use of the Confidential Information by the City.
After securing the NDA, Justin made a power point presentation of our findings and recommendations. Mr. Bradford informed Justin and Charles that the City had no inkling of this error. He also indicated that he would inform the Mayor. The April 21, 2016 NDA, hard copies of the presentation materials, and a proposed contract were left with Mr. Bradford.
After yet more delay, a follow-up meeting was finally held with Department Head Barbara Featherston, City Attorney William Bradford and CAO Brian Crawford on June 24, 2016. At the beginning of the meeting Ms. Featherston and Mr. Crawford both signed Acknowledgments of the April 21, 2016 NDA entered into by the City and that the disclosures being made to them were subject to the NDA's provisions and protections. In that meeting Ms. Featherston indicated that the error had to have been made by City employees. That meant that there was no 3rd party to pursue *229 effectively eliminating any chance of recovery for prior under billings absent the back billing of residential customers.[2]
On July 8, 2016, Mr. Bradford advised that the City had investigated and confirmed the error had been made by the City. He also advised that the City believed the error was costing the City approximately $1 Million per year.[3] Mr. Bradford went on to say the City basically would consider paying a one time fee of 10% of the under billing amounts for the period of time since the February 15, 2015 inception. Mr. Bradford also volunteered that the City would further engage Manchac for additional unspecified services. This coupling with other proposals was a City initiated proposal.
In response, Charles wrote a letter to Mr. Bradford and Mr. Crawford, dated July 18, 2016, which set forth a counter proposal. In light of the hundreds of thousands of dollars in lost revenue that any delay in implementation was costing the City, Charles letter requested finalization of the contract between the City and Manchac on or before August 1, 2016. No response was received.
On August 1, 2016, Charles made yet another effort to reach an agreement to allow the City to use the Confidential Information, but the City again failed to respond. Finally, in frustration over the City's non-response, all prior offers to settle were withdrawn on August 13, 2016.
As of last week, we now hold actual water bills which evidence that the City has, without our consent, utilized the Confidential Information in order to correct billings starting with the first of the 19 billing cycles in August, 2016. Disclosures that were made to individuals (other than William Bradford, Mayor Tyler, Barbara Featherston, and Brian Crawford) to correct the error were also not consented to and therefore also *230 constitute violations of the NDA. Furthermore, each of the City's implementations of a correct billing using the CONFIDENTIAL INFORMATIONconstitute a separate violation of the NDA.
Paragraph 10 of the NDA provides:
Each party acknowledges and agrees that remedies at law may be inadequate to protect the other party against actual or threatened breach of this Agreement by the other party, and accordingly, without prejudice to any other rights and remedies otherwise to either party, the parties agree that either party shall be entitled to seek injunctive relief, and further agree to waive, and further agree to use their best efforts to cause their employees, agents, and representatives to waive, any requirement for securing or posting any bond in connection with pursuit of any such remedy or any requirement of proving the inadequacy of a legal remedy. Recipient agrees that any unauthorized disclosure and/or utilization of Confidential information by Recipient, Recipient's employees or representatives shall result in a penalty of the greater of $10,000 or 25% of all savings or Increase in revenue that Recipient realizes from any unauthorized, direct or indirect, utilization of Confidential information. Such remedy shall not be deemed to be the exclusive remedy for a breach, but rather shall be in addition to all other remedies available at law or equity. In the event of litigation relating to this Agreement, the losing party will reimburse the prevailing party for its reasonable legal fees and expenses incurred in connection with any such litigation, including any appeal there from.
Frankly, I am both mystified and shocked by the City's bad faith conduct and it's blatant, willful violation of the NDA. We came to the City with the expectation of receiving thanks for making it possible for the City to quietly, and discreetly correct a very costly error. Such correction will literally mean millions of new dollars to the City coffers. Instead we have been dismissed, or characterized as adversaries, because we had the audacity to request a reasonable compensation that would be paid out of a portion of the first four years' of new dollars. Remember, we did not *231 create the problem, the City did. And the City did not find the solution, we did. And, absent our bringing the error to the City's attention, these huge loses would have gone on and on.
Ironically, the decision was made to recruit Justin Haydel/Manchac and Charles Grubb not only because of their expertise, but because of pre-existing friendships and an eagerness for them to be a part of what we viewed as a Win-Win situation. We thought as bearer of this valuable information, Manchac would be accruing enormous good-will that would likely lead to future business with the City. Had we believed otherwise we never would have enlisted their participation.
Why the City insisted on an NDA, entered into that NDA, and then proceeded to purposefully violate that NDA in the face of these penalties, is simply beyond my comprehension.
Implementation of the recommendation contained in the Confidential Information will produce millions of dollars in additional revenue which will better enable the City to service its debt, upgrade, and maintain the water and sewer systems. Our original proposal was both fair and reasonable. Our proposal is well within the parameters of the professional fee contracts the City has entered repeatedly to provide for collection actions as mandated by Resolution 114 of 2009 that are routinely reported on at each City Council session. Consequently, we now expect the City to execute an agreement with us to retroactively authorize the City's disclosure, use, and implementation of the Confidential Information without further delay.
Absent such an agreement, we will reluctantly accept an adversarial role because it is the only position the City has left us. Unfortunately, fulfilling that role will not be possible without all of this being made public, That in turn, will inevitably draw the attention and interest of those who have been adversely affected by the shortfall in revenue and to others who will find it irresistible for their own political gain. It's hard to believe the City has distorted our good intentions into this.
*232 Sincerely yours,
/S/ Michael H. Wainwright
Michael H. Wainwright

The plaintiffs' involvement did not come to light until much later, as will be set forth below.

A copy of the letter, which served as the catalyst for the events giving rise to this suit, is attached to the opinion. The first part of the letter consisted of introductory information about Wainwright's extensive experience in government and politics at all levels. The letter then turned to a discussion of the water billing matter.

Privilege is a defense to a defamation action. The doctrine of privilege rests upon the notion that sometimes, as a matter of public policy, in order to encourage the free communication of views in certain defined instances, one is justified in communicating defamatory information to others without incurring liability. Privileged communications are divided into two general classes: (1) absolute; and (2) conditional or qualified. An absolute privilege exists in a limited number of situations, such as statements by judges and legislators in judicial and legislative proceedings. A conditional or qualified privilege arises in a broader number of instances. There are a variety of situations in which the interest that an individual is seeking to vindicate or to further is regarded as sufficiently important to justify some latitude for making mistakes so that publication of defamatory statements is deemed to be conditionally or qualifiedly privileged. The elements of a conditional privilege have been described as good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner to the proper parties only. Hakim v. O'Donnell , supra . The existence of a qualified privilege is an affirmative defense. Qualified privilege raises a new matter which, assuming the allegations in the petition to be true, constitutes a defense to the defamation action and will have the effect of defeating the defamation claim. As such, qualified privilege must be specially pled. La. C.C.P. art. 1005 ; Costello v. Hardy , supra . In this case, the defendants did not raise the affirmative defense of privilege or qualified privilege.

We note that La. C.C.P. art. 971 provides that, in considering whether the statute applies, courts are to consider the pleadings and supporting and opposing affidavits. The jurisprudence construing the statute indicates that courts often consider more than pleadings and affidavits. All the parties in this matter have included voluminous attachments to their pleadings, without objection. We have considered everything contained in the record below, which consisted of approximately 400 pages at the time of the argument on the motion.

At the time of the events in this matter, La. R.S. 14:66 provided the following definition of extortion:
A. Extortion is the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description. Any one of the following kinds of threats shall be sufficient to constitute extortion:
(1) A threat to do any unlawful injury to the person or property of the individual threatened or of any member of his family or of any other person held dear to him.
(2) A threat to accuse the individual threatened or any member of his family or any other person held dear to him of any crime.
(3) A threat to expose or impute any deformity or disgrace to the individual threatened or to any member of his family or to any other person held dear to him.
(4) A threat to expose any secret affecting the individual threatened or any member of his family or any other person held dear to him.
(5) A threat to cause harm as retribution for participation in any legislative hearing or proceeding, administrative proceeding, or in any other legal action.
(6) A threat to do any other harm.

See and compare Blevins v. W.F. Barnes Corp. , 768 So.2d 386 (Ala. Civ. App. 1999) ; Brodkorb v. Minnesota , 2013 WL 588231 (D. Minn. Feb. 13, 2013).

The plaintiffs argue that, by virtue of "posted" comments made by readers in response to the news articles, they have shown that the statements made by the defendants constituted defamation and caused damage to their reputations in the community. We have examined the comments in the record. While some include the expression of opinion that the actions of the plaintiffs were wrong, some were actually favorable to the plaintiffs. The comments simply fail to demonstrate that the plaintiffs have established the probability of success on their defamation claims.

Further, California appears to recognize that the remedy afforded by its anti-SLAPP statute extends to statements and writings of governmental entities and public officials on matters of public interest and concern that would fall within the scope of the statute if such statements were made by a private individual or entity. See Vargas v. City of Salinas , 46 Cal.4th 1, 92 Cal.Rptr.3d 286, 205 P.3d 207 (2009).