Judgment rendered May 17, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,933-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JACKELYN YANONG                                    Plaintiff-Appellee

versus

JENNY DAWSON COLEMAN,                              Defendants-Appellants
ET AL.

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 609429

Honorable Ramon Lafitte, Judge

* * * * *

| | |
|---|---|
| GILLEY & GILLEY<br>By: Patricia Ann Dordan Gilley | Counsel for<br>Defendants/Appellants,<br>George Eric Hatfield and<br>Amy Senn |
| LAUREN RAY ANDERSON | Counsel for<br>Defendant/Appellant,<br>Amy Senn |
| RONALD J. MICIOTTO<br>JUSTIN SMITH | Counsel for<br>Plaintiff/Appellee,<br>Jackelyn Yanong |
| JENNY DAWSON COLEMAN | Defendant/Appellee,<br>In Proper Person |

* * * * *

Before MOORE, GARRETT, and ROBINSON, JJ.

**GARRETT, J.**

In this defamation suit, defendants George Eric Hatfield and Amy Senn appeal from a trial court judgment which awarded damages of $15,000 in favor of the plaintiff, Jackelyn Yanong. We affirm the trial court judgment.

## FACTS

The plaintiff is the wife of Danny Lawler, who published "The Inquisitor," a weekly newspaper in Caddo Parish. She is originally from the Philippine Islands and is apparently significantly younger than her husband. They married in July 2018. The three defendants are George Eric Hatfield, a Caddo Parish constable and real estate developer; his fiancée and the mother of his two young children, Amy Senn; and his cousin, Jenny Dawson Coleman. The record indicates that Hatfield and Senn have a longstanding acrimonious relationship with Lawler that apparently played out to some degree in Lawler's newspaper. Coleman, who lived in South Carolina, hosted a podcast show on her Facebook page, which she called the Jenny C Show or the Jenny Coleman Show. It was broadcast on Facebook Live and recordings of it were available for later viewing. Hatfield and Senn each made several appearances on the podcasts. The defendants allegedly made comments on the show questioning whether Lawler was involved in sex trafficking of underage females and whether the plaintiff was a victim of such trafficking and/or a prostitute. Additionally, Senn allegedly made comments in a similar vein on her Facebook page; in one such post, she referred to the plaintiff and Lawler's marriage as "[l]egalized prostitution."

The plaintiff filed her original petition against Hatfield and Coleman in June 2018, a month before her marriage to Lawler, alleging that they

falsely claimed she was a prostitute on numerous occasions. She further asserted that they made false and defamatory statements that her family sold her to Lawler in the Philippines at age 16 and that she was 17 or 18 when she entered this country and that she was "a little girl." (She stated that she was born in November 1997.) She additionally alleged that the defendants had live video podcasts and that they stated on numerous occasions that they contacted the Philippine authorities to notify them that Lawler was a sex trafficker and that the plaintiff was involved in sex trafficking. The plaintiff contended that she was a private person, not a public figure. Senn was added as a defendant in the plaintiff's first amended petition, which was filed in November 2018. The plaintiff alleged that Senn made false and defamatory comments on her Facebook page, in which she accused the plaintiff of being bought through a catalogue or a website called "Loveme.com." Senn also posted that the plaintiff's marriage was legalized prostitution and that the plaintiff could have worked in a sweatshop. Hatfield and Senn, in proper person, each generally denied the allegations in separately filed answers. A curator ad hoc was appointed to represent Coleman.

On July 22, 2019, the plaintiff propounded, by certified mail, a request for admissions of fact to the defendants pertaining to their alleged statements to others about the plaintiff and whether they contacted an organization that fights human trafficking and claimed that the plaintiff was underage.[1] The statements about the plaintiff allegedly made to others were: (1) she is or was a prostitute; (2) she was 16 years old when purchased by

---

[1] The original petition alleged that Coleman contacted this organization.

2

Lawler; (3) she was bought in the Philippines; (4) her family sold her to Lawler; (5) she was involved in sex trafficking; (6) she worked in a sweatshop and was bought through a catalogue; and (7) she was purchased through "Loveme.com."

In September 2019, the plaintiff filed a motion for the court to order the request for admissions of fact admitted as to Hatfield and Senn. She included proof of service upon Hatfield and Senn, neither of whom had responded. (On August 22, 2019, Senn, who lived with Hatfield, signed the certified mail return receipt to him on his behalf, as well as her own certified mail return receipt.) An order was signed by the trial court on October 2, 2019, decreeing that the request for admissions of fact was deemed admitted as to Hatfield and Senn.[2] On October 7, 2019, Senn filed a document entitled "answer to motion for court to order request for admissions of fact," in which she appeared to generally deny the allegations in the six paragraphs of the motion to have the request for admissions deemed admitted.[3] On October 21, 2019, Coleman filed a document with the same caption which appeared to deny the eight requests for admissions of fact. Hatfield filed no response to the request for admissions of fact or the motion to have them deemed admitted. None of the defendants requested that the trial court reconsider its order deeming the request for admissions of fact admitted.

Trial was set for October 24, 2019. On that day, counsel enrolled for Senn. Having discharged his duties to contact Coleman, the curator was allowed to withdraw. The trial court then granted Senn's and Coleman's

_____

[2] A typographical error on the order incorrectly stated the year as "2018."

[3] The sixth paragraph of Senn's document utilizes language similar to that found in the sixth paragraph of the motion.

motions for continuance without objection by the plaintiff.  Thereafter, a one-day bench trial was held on February 4, 2020.  Of the defendants, only Hatfield and Senn were present, and only Senn was represented by counsel. The plaintiff presented her own testimony and called Hatfield and Senn to testify during her case-in-chief.  Senn called Lawler as a witness.  The podcasts were admitted into evidence, and pertinent portions were played during Hatfield's and Senn's testimony.  At the conclusion of the evidence, the trial court found that the plaintiff had been defamed and requested submission of briefs on the issue of damages.  On June 18, 2020, the trial court gave extensive oral reasons for judgment in court.  It found that the defendants' statements were defamatory per se because the plaintiff was defamed by accusations of criminal activity, i.e., prostitution and sex trafficking.  As a result, the elements of malice, falsity and injury were presumed.  Finding the plaintiff to be a credible witness, the trial court awarded her damages of $15,000.  Judgment against all three defendants, in solido, was signed on July 16, 2020.  Court costs were cast against the defendants.

Hatfield and Senn appeal, asserting four assignments of error.  In two assignments of error, they allege lack of evidence to support the plaintiff's claim of defamation and the trial court's award of damages.  Additionally, they complain about the pretrial self-recusals of two district court judges and contend that the trial judge who heard the case was biased and denied them a fair trial.

## DEFAMATION AND DAMAGES

On appeal, Hatfield and Senn do not seriously contest the fact that they made the statements in question.  They argue that the plaintiff failed to

4

carry her burden of proof on her defamation claim and that their comments were constitutionally protected speech on matters of public concern, i.e., sex trafficking in the community. They also contend that the plaintiff failed to prove that she suffered damages as a result of their actions.

To the contrary, the plaintiff maintains that the defendants' statements about her were not protected speech and that she satisfied all of the elements of defamation. As to the contents of the statements made by the defendants in the podcasts and Facebook posts, she recites them in detail in her brief. Of particular note, they included: (1) in the podcasts, Hatfield made several references to the plaintiff being involved in sex trafficking and referred to her as a prostitute Lawler bought and brought home with him; (2) Senn admitted in her deposition that she made the "legalized prostitution" comment and that she said that the plaintiff had been bought in the Philippines; and (3) Senn referred to "targeting someone" Lawler cared about. The plaintiff also argues that the damages awarded by the trial court were supported by the record.

### *Law*

The right to free speech is guaranteed in the constitutions of both the United States and Louisiana. *Wainwright v. Tyler*, 52,083 (La. App. 2 Cir. 6/27/18), 253 So. 3d 203. The First Amendment to the United States Constitution provides in pertinent part:

> Congress shall make no law . . . abridging the freedom of speech, or of the press[.]

Louisiana Constitution Art. 1, § 7, states:

> No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.

Louisiana's interest in protecting the reputations of private individuals is clearly expressed and preserved in our constitution, which has expressly balanced the right of free speech with the responsibility for abuse of that right. *Kennedy v. Sheriff of E. Baton Rouge*, 2005-1418 (La. 7/10/06), 935 So. 2d 669.

The United States Supreme Court has held that not all speech is of equal First Amendment importance. It is speech on matters of public concern that is at the heart of the First Amendment's protection. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985). Matters of public concern relate to any matter of political, social, or other concern to the community. Whether speech addresses matters of public concern must be determined by the content, form, and context of a given statement, as revealed by the entire record. *Wainwright*, *supra*; *Hakim v. O'Donnell*, 49,140 (La. App. 2 Cir. 6/25/14), 144 So. 3d 1179, *writ denied*, 2014-1501 (La. 11/7/14), 152 So. 3d 175, *cert. denied*, 575 U.S. 936, 135 S. Ct. 1714, 191 L. Ed. 2d 678 (2015).

Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. *Kennedy*, *supra*; *Costello v. Hardy*, 2003-1146 (La. 1/21/04), 864 So. 2d 129; *Quinlan v. Sugar-Gold*, 51,191 (La. App. 2 Cir. 4/5/17), 219 So. 3d 1173. Abuses of the right to free speech are actionable under Louisiana law. A cause of action for defamation arises out of a violation of La. C.C. art. 2315. *Hakim*, *supra*.

Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. *Kennedy*, *supra*; *Costello*, *supra*;

6

*Wainwright*, *supra*. The fault requirement is often set forth in the jurisprudence as malice, actual or implied. Thus, in order to prevail on a defamation claim, a plaintiff must prove "that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused the plaintiff damages." If even one of the required elements of the tort is lacking, the cause of action fails. *Costello*, *supra*; *Hakim*, *supra*.

The threshold issue in a defamation action is whether the words complained of are defamatory, *i.e.*, capable of a defamatory meaning. *Costello*, *supra*; *Quinlan*, *supra*. A statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule. *Kennedy*, *supra*; *Hakim*, *supra*.

In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. *Kennedy*, *supra*; *Wainwright*, *supra*.

Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se. When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Injury may also be presumed. *Kennedy*, *supra*; *Costello*, *supra*; *Quinlan*, *supra*.

The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court. The question is answered by determining whether a

7

listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense.  *Wainwright*, *supra*.

The intent and meaning of an alleged defamatory statement must be gathered, not only from the words alleged to be defamatory, but from the context as well.  The true meaning must be ascertained from a consideration of all parts of the statement, as well as the circumstances of its publication.  The test is the effect it is fairly calculated to produce and the impression it would naturally engender in the minds of the average persons by whom it is heard.  *Wainwright*, *supra*.

Even when a plaintiff makes a prima facie showing of the essential elements of defamation, recovery may be precluded if the defendant shows either that the statement was true, or that it was protected by a privilege, absolute or qualified.  *Costello*, *supra*.  Privilege is a defense to a defamation action.  *Kennedy*, *supra*; *Wainwright*, *supra*.  The existence of a qualified privilege is an affirmative defense, which must be specifically pled.  *Costello*, *supra*; *Wainwright*, *supra*.

The injury resulting from a defamatory statement may include nonpecuniary or general damages, such as injury to reputation, personal humiliation, embarrassment and mental anguish, even when no special damage such as loss of income is claimed.  Regardless of the type of injury asserted, however, a plaintiff must present competent evidence of the injuries suffered.  A plaintiff must also demonstrate that the defamatory statements were a substantial factor in causing the harm.  *Costello*, *supra*; *Quinlan*, *supra*.  An award of damages in a defamation case is left to the great discretion of the trier of fact and should not be disturbed absent a

showing of manifest error.  *Connor v. Scroggs*, 35,521 (La. App. 2 Cir. 6/12/02), 821 So. 2d 542.

### *Evidence*

Among the evidence introduced at trial were eight videos of Coleman's podcasts in which Hatfield and Senn separately participated. Hatfield appeared in five of these podcasts and Senn in three of them. Contrary to Hatfield's and Senn's claims in their appellate brief that they were essentially unwitting pawns of Coleman, who "used bits of Facetime conversations she had" with them, and that they had no knowledge of "how she may have cut and pasted anything they may have shared over the last few years," review of the podcasts demonstrates that Hatfield and Senn were willing and knowing participants who were aware that the show was broadcast live and that people were watching and commenting upon their statements.[4]

In brief and at trial, Hatfield and Senn sought to cast themselves as genuinely distressed by sex and human trafficking and deeply concerned about the plaintiff's well-being.  However, at various points in the podcasts, they seem to find the relationship between the plaintiff and Lawler humorous, such as when Hatfield joked about Lawler being lucky he had not been stopped by the police while the plaintiff was a passenger in his vehicle because the youthful plaintiff was not riding in a booster seat.  Additionally, at different points in the litigation, they asserted that they were not

---

[4] In their appellate brief, as at trial, Hatfield and Senn attempt to distance themselves from Coleman.  In his deposition, Hatfield testified that Coleman was his cousin because her mother married his uncle.  At trial, Hatfield stated that she was not his cousin "now."  Senn testified at trial that Hatfield never told her he was related to Coleman and that she now understood they were related by marriage or adoption.  However, their onscreen banter with Coleman during the podcasts was suggestive of a closer relationship than Hatfield and Senn were willing to acknowledge at trial.

necessarily referring to the plaintiff when they talked about women that Lawler allegedly paid for sex. However, in his deposition, Hatfield stated that he was "sitting here because I made a comment against someone whose [sic] an illegal immigrant." When queried as to whom he was referring, he responded, "The Yingdong or the girl that filed the suit, the girl . . . [t]he one that was purchased through Loveme.com by Danny Lawler."

Review of the podcasts reveals numerous comments by Hatfield about the plaintiff. In the May 16, 2018 podcast, he said that Coleman had found the contract where Lawler "bought" her and the amount that Lawler paid the plaintiff's family. He additionally stated, "The little girl that he bought from the Philippines – they've only seen her one time since he took her to that church he goes to and she was wearing daisy dukes . . . . Danny bought the girl . . . . Well, she's like 16 or 17 years old . . . . This poor girl did this . . . she's laid up with Silence of the Lambs over here just simply so her family can survive . . . . it's sad that people in these countries have to live like this and sell their children." He later made the booster seat joke. In the May 21, 2018 podcast, he again referred to her as "the little girl that [Lawler] bought from the Philippines." He also said she looked to be 12 or 13 years old but was supposedly 16 or so when Lawler bought her and 16 or 17 years old when she came to this country. Hatfield then discussed Lawler taking a photo of her in front of an Escalade and in bed with him. He said she came from an impoverished family, which had sold her to Lawler. Hatfield asserted that Lawler was 53 and the plaintiff was 17.

In the June 14, 2018 podcast, Hatfield stated that he had not received an invitation to the plaintiff's wedding to Lawler. (According to the Lawlers' testimony, they married in July 2018.) He said that it would have

10

been his first illegal wedding where there was a "fake bride" or you married someone you bought on the internet. He went on to say:

> What happens, Danny, if someone, anyone with any sense, stands up at this fake wedding that you are about to have where you marry an illegal alien that is here on a work visa that you met and purchased online, . . . we can prove that, . . . you're still paying her family, she's not paid for, . . . I guess it's a lease to own, or however you do that on Loveme.com.

Coleman then laughed about the lease-to-own joke about the plaintiff. Hatfield stated that "any lawful citizen" at the wedding should stand up and object at the wedding on the grounds that it was an unlawful marriage because Lawler purchased the plaintiff and it constituted sex trafficking. He later made a joke about the plaintiff having a Visa card to go to a Build-A-Bear store, a retail store where customers can customize stuffed animals. Thereafter, Hatfield made the following statements:

> Can you imagine . . . selling your l6-year old daughter . . . and she comes over and lives in Danny's dungeon . . . . [T]he swing that I heard she's getting on is not one you're going to see in my front yard.
> . . .
> Well, Danny, you bought a prostitute and you brought her back home with you . . . . that's what that is. When you purchased a woman and she comes back because you purchased her . . . she comes home with you because you bought her, that is what that is.

In her podcast appearances, Senn made several references to the plaintiff. During the January 27, 2018 podcast, she stated that Lawler had gone overseas a couple of times to buy a mail-order bride, "the recent victim of this mail-order bride" scheme had just turned 20 years old, and Lawler had purchased her through a company called Loveme.com. At trial, she admitted that the 20-year-old woman she mentioned was the plaintiff. In a podcast on April 2, 2018, she stated that "the guy [Lawler] is overseas

11

buying women because he can't get somebody for free." She and Coleman later discussed the legality of mail-order brides in the Philippines, and Senn mentioned the plaintiff by her first name with Coleman speculating that she was 15 or 16 when she met Lawler. Senn replied, "No one really knows her real age anyway." On the May 10, 2018 podcast, she and Coleman discussed the plaintiff's arrival, with Senn saying there was a welcome-home party with a big sign that welcomed the "new bride." Senn also talked about how social media was their "voice," and Coleman was helping them.

Also admitted were Senn's Facebook posts. In response to a suggestion from another poster that Lawler put something about "the Filipino wife he bought in his paper," she posted, "Legalized Prostitution." Responding to another post, she stated, "[H]er name is Jackie and unfortunately I do believe she was purchased through a company. It is very sad but she could also work in a sweat shop. You never know." Another response by Senn was, "[H]e did buy her. Apparently there's a catalogue???" She posted a link to Loveme.com and said "this is where he purchased her." She later posted the link again, saying, "This is where Danny bought his Filipino girl." She posted some photos and stated, "This is her. She is very young. So sad."

At trial, Senn admitted that she had never met the plaintiff, and that she had no proof that the plaintiff was a prostitute or that she had worked in a sweat shop. She denied "targeting" the plaintiff, asserting instead that she was targeting Lawler. However, she was confronted with her deposition testimony in which she discussed her participation in the podcasts and had admitted, "I'm targeting someone [Lawler] cares about. . . . I feel like looking at these videos I'm ashamed. . . I hope – I don't want her to hurt, but

12

I want her to know that this is not who I am. So I'm ashamed that I said these things." She also admitted at trial that she had no proof that the plaintiff was purchased by Lawler.

### *Discussion*

We note that Hatfield's and Senn's joint appellate counsel was not involved in the trial. Also, while their counsel noted in the procedural history of the case contained in their brief to this court that only the transcript of the morning session of the trial was included in the appellate record, the appellants made no effort to have the transcript of the afternoon session supplemented into the record.[5] Instead, our clerk of court's office was required to contact the lower court to obtain the missing transcript of the rest of the trial in order to allow us to conduct a full review. As a result of joint appellate counsel's unfamiliarity with the proceedings below and the incomplete trial transcript, many assertions made in Hatfield's and Senn's appellate brief are not supported by the record.

Of particular note was their contention in their brief that there was no proof of publication of the defamatory statements to a third party. An "unprivileged publication to a third party" is an element of defamation.[6] As previously mentioned, it is clear from watching the podcasts that Hatfield and Senn were fully aware that they were engaging in interactive discussions with third parties who participated in the broadcasts. Coleman was shown onscreen on all the broadcasts, as were Hatfield or Senn, depending upon

---

[5] Despite knowledge of the missing transcript, after discussing the plaintiff's testimony in their brief to this court, Hatfield's and Senn's joint appellate counsel wrote, "On behalf of the appellants, counsel will not go through any more of the trial testimony as the court will have no problem reading it themselves[.]"

[6] Since Hatfield and Senn failed to specifically plead it, the issue of privilege is not before us.

which one was participating in that particular podcast. Third parties would enter the conversations by sending messages that were obviously visible to the podcast participants, who frequently acknowledged or discussed them. Among the comments made by Hatfield and/or Senn showing that they were aware that they had an audience and third parties were engaged in the interactive broadcast were the following:

> • I wanted to jump on and just say hi to everybody . . . . This movement that we have started on here . . . . [Senn, 4-2-18]

> • To the law enforcement officers that have called and offered their support . . . thank you to every one of you, we appreciate it. [Hatfield, 4-19-18]

> • Coleman: "This is live TV." Hatfield: "I know." [4-26-18]

> • There's a couple that may be watching right now . . . . But you can also look at all the people that are watching this . . . . [Hatfield, 4-26-18]

> • I've gotten tons of messages in the last few weeks asking when we'd do a live so we're here . . . . This social media movement is our voice . . . . Jenny's helping us do this and helping us speak out about this. . . . Hi, Mike . . . . Mike just popped on . . . . So Danny monitors our live. He gets on here and sees who comments and stuff . . . . He'll see who's on our live and pull their records. [Senn, 5-10-18]

> • Several people that are watching right now that I see, I don't say your names because I don't know if everybody else can see your name . . . . [Hatfield, 5-16-18]

Accordingly, any argument by the defendants that the plaintiff failed to prove the element of publication is without merit.

We have thoroughly reviewed the appellate record, including the pertinent portions of the podcasts which were admitted into evidence. The record demonstrates that Hatfield and Senn each made statements in which they accused the plaintiff of being a prostitute and a participant in sex trafficking. The utterance of the statements was thoroughly proven through

14

Hatfield's and Senn's own words in the podcasts and in Senn's Facebook posts, not just the requests for admissions which were deemed admitted. Furthermore, these statements against the plaintiff, a private person, appear to have nothing to do with any lofty discussions of matters of "public concern," such as sex trafficking. Instead, taken in their proper context, they appear to be nothing more than attacks and angry outbursts in an ongoing and very personal feud with the plaintiff's husband.

The record demonstrates that the trial court found the plaintiff to be a credible witness and that it accepted as true her testimony denying that she was involved in prostitution or sex trafficking. We find that the trial court correctly held that, since prostitution and sex trafficking are criminal offenses, these statements made by Hatfield and Senn were defamatory per se, and, consequently, falsity and malice were presumed but rebuttable by the defendants. However, Hatfield and Senn failed to present any evidence supporting their statements about the plaintiff. Although the plaintiff was not required to show malice, Senn candidly admitted in her deposition that she was "targeting" the plaintiff in an effort to harm Lawler. Based on the foregoing, we find that the trial court properly held that the plaintiff proved all of the elements of defamation at trial.

As to the issue of damages, the plaintiff presented her own testimony to establish the humiliation, embarrassment, and mental anguish she suffered as a result of Hatfield's and Senn's defamatory statements. When ruling in her favor, the trial court specifically found the plaintiff to be credible. It was unpersuaded by the defendants' argument that she had failed to present competent evidence of her damages because she was the only witness to testify on that subject. In so ruling, the trial court properly relied upon

15

*Blades v. Olivier*, 98-1957 (La. App. 1 Cir. 6/25/99), 740 So. 2d 755, wherein an award supported by only the plaintiff's testimony was affirmed. However, the trial court concluded that her testimony supported an award of only $15,000, as opposed to the $50,000 she requested. After a complete review of the record, we find no abuse of the trial court's discretion in making this award. Accordingly, we affirm the trial court's award of damages to the plaintiff.

## ASSIGNMENTS PERTAINING TO JUDGES

In two separate assignments of error, Hatfield and Senn assert issues concerning district court judges.

### *Self-recusals*

In one assignment of error, Hatfield and Senn complain that two district court judges to whom the case was first randomly assigned self-recused because they knew Hatfield; one judge also stated that he knew Lawler. Under certain circumstances, a judge may recuse himself sua sponte. La. C.C.P. art. 152. There is no indication in the appellate record that Hatfield and Senn ever objected to the self-recusals. Since this matter was not raised in the lower court, it is not properly before this court on appeal. Accordingly, we pretermit consideration of it.

### *Alleged bias of trial judge*

In the other assignment of error, Hatfield and Senn contend that the district court judge who presided over the trial was biased and, as a result, they were denied a fair trial. However, a review of the appellate record belies those accusations and reveals that the trial judge went to great lengths to conduct the proceedings in an evenhanded and impartial manner. For example, because Hatfield represented himself at trial, he was somewhat at a

disadvantage against the plaintiff's experienced attorney, who objected frequently but appropriately, especially when Hatfield attempted to raise matters which were inadmissible or irrelevant to the proceedings. The trial court ruled on the objections properly and explained his rulings thoughtfully and thoroughly. Hatfield and Senn also complain that the trial court did not show them leniency after they failed to answer the plaintiff's request for admissions of fact. However, neither sought reconsideration of the order deeming the request for admissions of fact admitted. In fact, when the matter was discussed during the trial, counsel for Senn specifically stated that she had no desire to overturn or appeal that order. Finally, Hatfield and Senn did not raise their claim of bias below by filing a motion to recuse the trial judge. Accordingly, we find that this assignment lacks merit.

## CONCLUSION

The trial court judgment in favor of the appellee, Jackelyn Yanong, is affirmed. Costs of this appeal are assessed to the appellants, George Eric Hatfield and Amy Senn.

**AFFIRMED.**

17