Judgment rendered June 26, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,623-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

| | |
|---|---|
| HAL CARTER AND DREAM CREATIONS, LLC | Plaintiff-Appellant |

versus

| | |
|---|---|
| ABC NEWS, INC. D/B/A ABC NEWS PRODUCTIONS D/B/A 20/20 NEWS MAGAZINE | Defendant-Appellee |

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 636,470

Honorable Michael A. Pitman, Judge

* * * * *

| | |
|---|---|
| HAL CARTER | In Proper Person/Agent, Dream Creations, LLC |
| PHELPS DUNBAR, LLP<br>By: Dan Bryan Zimmerman<br>     Mary Ellen Roy | Counsel for Appellee, ABC News, Inc. |
| DAVIS, WRIGHT, TREMAINE, LLP<br>By: Nathan Siegel | |
| MCMICHAEL & CARTER, LLC<br>By: James C. McMichael, Jr. | Counsel for Appellee, KTBS, LLC |

* * * * *

Before THOMPSON, ROBINSON, and MARCOTTE, JJ.

**ROBINSON, J.**

In this appeal, we are confronted with the question of whether a cause of action for defamation and/or intentional infliction of emotional distress exists when a nationally televised news program about an infamous serial killer's murder spree in Gainesville, Florida (1) did not mention that the plaintiff Hal Carter had earlier been a suspect in a triple-homicide in Shreveport, (2) stated that police had no suspect in the Shreveport murders, and (3) did not mention that Carter had facilitated the serial killer's confession to the Shreveport murders. Concluding that no cause of action exists, we affirm the judgment insofar as it granted the exceptions of no cause of action and dismissed the plaintiffs' claims. However, we further conclude that the defendants' La. C.C.P. art. 971 special motions to strike should have been granted and not declared moot. Accordingly, we reverse the judgment in part and remand the matter to the trial court for a determination of costs and attorney fees.

## FACTS

On Monday, November 6, 1989, the bodies of Julie Grissom, her father, William "Tom" Grissom, and her eight-year-old nephew, Sean Grissom, were discovered at Tom Grissom's home in Shreveport. All three had been murdered ("Grissom murders"). Hal Carter, who was a Shreveport attorney at the time and who had recently ended his romantic relationship with Julie Grissom, quickly became a suspect in the Grissom murders, or as Carter describes himself, the "prime suspect." Carter, who was never arrested in the Grissom murders, moved to Washington near the end of 1989 in an attempt to escape the cloud of suspicion which had enveloped him.

In August of 1990, Danny Rolling ("DR"), a former Shreveport resident, murdered five college students in their apartments over three separate incidents in Gainesville, Florida. DR was ultimately convicted of the murders of Sonja Larson, Christina Powell, Christa Hoyt, Tracy Paules, and Manny Taboada. Shortly before his execution in 2006, DR confessed to the Grissom murders through a written statement in which he wrote in part that "HAL CARTER, Julie Grissom's former fiancé is 100% INNOCENT – TOTALLY PURE of that crime."

After several years in Washington, Carter moved to Atlanta, Georgia to practice law again. Carter spent nearly a decade attempting to build what is best described as a "brand" out of his role as a "prime suspect" in the Grissom murders. He even formed a business entity, Dream Creations, LLC ("Dream Creations"), in 2019 to create and market products based on his life experiences following the Grissom murders.

On April 9, 2021, the ABC television network news show 20/20 presented a two-hour program about DR and the murders he had committed that was titled, "The Devil in Gainesville" ("DIG"). KTBS, Shreveport's ABC affiliate station, invited Carter to participate in a live interview during the broadcast of DIG.

Most of the two-hour DIG program focused on the Gainesville murders, which is understandable considering that this nation had been horrified by the depravity of those murders and relieved by the subsequent arrest and conviction of DR. The Grissom murders were not mentioned until 54 minutes into the telecast, just before a commercial break.

2

During the remaining hour of the telecast, no more than eight minutes were spent discussing the Grissom murders. DIG showed interviews with Julie Grissom's brother and sister-in-law, a Shreveport resident who knew DR and told law enforcement in Florida that she suspected DR was the Gainesville killer, a crime author, and a Florida investigator.

Articles from *The (Shreveport) Times* ("*Times*") were displayed during the broadcast of DIG: (1) a November 7, 1989, article with the headlines, "Triple Murder rocks Southern Hills" and "Police: no motive, suspects"; (2) a November 8, 1989, article with the headline, "Police find no leads in triple murder"; (3) a November 10, 1989, article with the headlines, "Disturbed killer sought" and "Police say suspect was no stranger to Grissoms"; (4) a March 8, 1990, article with the headlines, "Grissom case at impasse" and "Police don't have any suspects in triple slaying"; and (5) an article from January 25, 1993, which had the headline, "Police return to square one in slayings[.]" The content of the March 8 article, which was blurred when shown on DIG, stated that the police had verified that Carter, who was originally targeted as a suspect, was in Atlanta during the Grissom murders.

Immediately after Julie Grissom's sister-in-law spoke about the discovery of the bodies, the March 8 article was displayed. The voice of the Florida investigator was then heard stating, "Their case was cold, at that point. Their case was a year old. They didn't have any suspects." The January 25 article was also displayed as the investigator spoke. Shortly after, the November 8 and 10 articles were shown as the former Shreveport resident who contacted law enforcement was interviewed.

3

Near the end of the program, DIG informed viewers that shortly before his execution, DR confessed to the Grissom murders. Video of DR's pastor reading part of his confession was shown. Carter was never mentioned at any point during the program.

Aggrieved at being overlooked by ABC when DIG was produced and broadcast, Carter and Dream Creations filed a 75-page petition for damages against ABC News, Inc. d/b/a ABC News Productions d/b/a 20/20 News Magazine. KTBS LLC d/b/a KTBS Channel 3 was also made a defendant even though it was not named in the case caption.

On April 19, 2022, Carter and Dream Creations (together referred to as "plaintiffs") filed an 85-page amended petition. Among the exhibits attached to the petitions were the cover and an excerpt from Carter's book, "Trials by Fire Life Lessons"; local newspaper articles about the Grissom murders and investigation; and DR's written confession.

The petitions alleged that Carter had been the primary or prime suspect in the Grissom murders. The plaintiffs also claimed that shortly before DR's execution, Carter helped orchestrate DR's confession to the Grissom murders.

The petitions alleged that Carter began working in 2016 on his "When Tomorrow Never Comes" book and movie screenplay. He also began delivering free motivational speeches. Because of the response to his speeches, Carter set aside his book and screenplay so he could write a health and wellness self-improvement book. Carter planned to launch the promotional campaign for his "Trials By Fire Life Lessons" book, motivational speeches, and life coaching in May of 2021, but before he

could do so, ABC aired DIG on April 9, 2021. The plaintiffs also asserted that KTBS invited Carter to be interviewed live during the broadcast of DIG.

The plaintiffs contended that ABC went beyond simply omitting Carter from its program, but also created the false storyline that DR had been the only suspect in the Grissom murders. They accused ABC of purposely concealing or misconstruing newspaper articles showing that Carter had been a suspect. For example, DIG communicated to viewers that the Shreveport Police Department had no suspects a year after the Grissom murders, but the article displayed was dated four years after the murders.

The plaintiffs also complained that an early suspect in the Gainesville murders was considered important enough by ABC to be included in DIG, yet Carter was excluded even though he was just as material to the Grissom murders as that suspect was to the Gainesville murders.

The plaintiffs alleged that ABC defamed them by falsely leading viewers to believe DR had been the only suspect in the Grissom murders, which made Carter appear to be lying about being the prime suspect.

Moreover, not only did DIG never mention or allude to Carter or how he orchestrated DR's confession, but when DIG showed video of DR's pastor reading the confession, it omitted the part of DR's confession where he wrote that Carter was completely innocent. The plaintiffs contended this also led viewers to believe that DR had been the only suspect in the Grissom murders.

The plaintiffs further alleged that KTBS breached its duty to Carter as a business invitee when he was interviewed on April 9, 2021, and then when

KTBS declined to give him the opportunity to defend himself in a second interview.

The plaintiffs maintained that because of Carter's emotional state following the telecast of DIG, he canceled the launch of his book, motivational speeches, and life coaching for the foreseeable future.

In July of 2022, ABC filed the exception of no cause of action and the La. C.C.P. art. 971 special motion to strike. Attached to the motion were a copy of Carter's lawsuit against the *Times* in 1990 and a transcript of DIG. Carter had sued the *Times* seeking damages for its alleged breach of contract and defamation of Carter. He alleged that a reporter's incorrect and sensationalized version of what Carter had told him contributed to the Shreveport Police Department and the general public looking at Carter as a serious suspect in the Grissom murders. He also alleged that Shreveport Police Department detectives defamed him by holding a press conference and leading much of the public to believe that Carter was the murderer. The lawsuit was dismissed as abandoned in 1999.

KTBS also filed the exception of no cause of action and the special motion to strike.

On August 29, 2022, the plaintiffs filed a motion for La. C.C.P. art. 971 discovery. On October 8, 2022, the plaintiffs filed a supplemental motion for art. 971 discovery to aid them in establishing a probability of success on their claims. They complained that the defendants had not produced all videos and scripts that had been requested.

The defendants opposed the discovery motions on the grounds that the initial motion was moot because there was nothing left to produce, and the

6

supplemental motion failed because discovery is the exception rather than the rule under art. 971 when a special motion to strike is filed. In addition, the defendants argued that the plaintiffs had not presented good cause for why any specified discovery should be conducted. Finally, the defendants maintained that the motions to strike concerned elements of defamation claims that presented questions of law, which made discovery unnecessary to resolve the legal issues.

In their opposition to the defendants' exceptions of no cause of action and motions to strike, the plaintiffs attached: (1) videos and on-air scripts produced by KTBS through discovery; (2) three KTBS website pages that Carter had found by googling "KTBS Hal Carter stories"; (3) an affidavit from a friend of Carter about his evaluation of DIG; and (4) Carter's affidavit. The plaintiffs sought discovery to determine why ABC "went to such lengths to cut him out of [DIG] and defame Hal Carter."

Following a hearing on the exceptions, the trial court rendered judgment on January 30, 2023, sustaining the exceptions of no cause of action and dismissing the plaintiffs' claims. The special motions to strike were denied as moot because the exceptions of no cause of action had been sustained.

On May 11, 2023, Carter and Dream Creations filed a motion for appeal. On that same date, they also filed a motion for leave of court to amend and supplement the amended petition, which was denied.

ABC and KTBS have answered the appeal to seek a reversal of the part of the judgment denying the special motions to strike as moot.

*Appeal*

Carter and Dream Creations (together referred to as "appellants") appeal the granting of the exceptions of no cause of action as well as the trial court's denial of their motion for leave to amend and supplement their amended petition. They contend that the trial court erred in dismissing their defamation, intentional infliction of emotional distress, and business invitee claims by not accepting their allegations as true and not viewing their factual pleadings in a light most favorable to them with all doubts resolved in favor of the appellants having stated a valid claim.

In their answers, ABC and KTBS contend that the trial court properly sustained the exception of no cause of action, but erred in concluding the special motions to strike were moot.

We note that Carter appears *pro se* individually as well as on behalf of Dream Creations LLC. Carter was an attorney in Louisiana and Georgia at one time, but has not signed his pleadings with a bar roll number. A search of the Louisiana State Bar Association member directory online shows that an attorney named James H Carter Jr. in Shreveport resigned from the practice of law in 2015.

As a general rule, corporate entities must be represented by counsel. *D.W. Thomas & Son, Inc. v. Gregory*, 50,878 (La. App. 2 Cir. 11/23/16), 210 So. 3d 825. Even where a limited liability company has a sole shareholder, it is an entity separate and distinct from that shareholder in terms of procedural capacity. *Id.*

8

In spite of Carter representing Dream Creations in a *pro se* capacity, we will still consider all arguments made by him on behalf of Dream Creations on appeal because their claims are related.

**DISCUSSION**

The function of the peremptory exception of no cause of action is to test the legal sufficiency of the petition, which is done by determining whether the law affords a remedy on the facts alleged in the pleading. *Ramey v. DeCaire*, 03-1299 (La. 3/19/04), 869 So. 2d 114. La. C.C.P. art. 931 states that no evidence may be introduced at any time to support or controvert the objection that the petition fails to state a cause of action. Therefore, the court reviews the petition and accepts well-pleaded allegations of fact as true. *Ramey*, *supra*. All doubts are resolved in favor of the sufficiency of the petition to afford litigants their day in court. *Jackson v. City of New Orleans*, 12-2742 (La. 1/28/14), 144 So. 3d 876. The issue at the trial of the exception of no cause of action is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. *Ramey*, *supra*.

An appellate court's review of a trial court's ruling sustaining an exception of no cause of action is *de novo* because the exception raises a question of law, and the trial court's decision is based only on the sufficiency of the petition. *Grayson v. Gulledge*, 55,214 (La. App. 2 Cir. 9/27/23), 371 So. 3d 1133, *writ denied*, 23-01437 (La. 1/10/24), 376 So.3d 847.

*Defamation*

Ten "counts" of defamation were alleged in the petitions. The appellants argue that through false and deceptive communications and

9

statements, DIG intentionally led its viewers to believe that DR was the only suspect in the Grissom murders, which made Carter appear to be a liar about his "prime suspect" experience and that his upcoming projects were based on a lie. This forced the launch of the upcoming projects to be canceled.

The appellants maintain that ABC went beyond simply not mentioning Carter in DIG, but actually told viewers that the police did not have any suspects in the Grissom murders. In their view, ABC knowingly and intentionally created the DIG program to deceive its viewers into believing the storyline that DR had been the only suspect in the Grissom murders and that DR had confessed to the Grissom murders solely of his own volition. In doing so, ABC knowingly and intentionally concealed from the public that Carter was the original prime suspect in the Grissom murders and that he orchestrated DR's confession. For instance, the appellants accuse ABC of intentionally not displaying local newspaper headlines which refer to Carter as being a suspect, including a headline from the *Times* in which Carter refers to himself as a suspect.

ABC counters that it did not publish any statement of and concerning Carter, and even if it is assumed that ABC implied there were no other suspects in the Grissom murders, that would still not be a statement by ABC. Further, no statement made during the program could be considered defamatory of Carter. Thus, according to ABC, the defamation claim would fail because the appellants cannot establish any defamatory words concerning Carter.

The tort of defamation is the invasion of a person's interest in his or her reputation and good name. *Bradford v. Judson*, 44,092 (La. App. 2 Cir. 5/6/09), 12 So. 3d 974, *writ denied*, 09-1648 (La. 10/16/09), 19 So. 3d 482. Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. *Kennedy v. Sheriff of East Baton Rouge*, 05-1418 (La. 7/10/06), 935 So. 2d 669. The fault requirement is generally considered to be malice, actual or implied. *Id.*

If even one of the elements for a defamation claim is absent, the cause of action fails. *Wyatt v. Elcom of Louisiana, Inc.*, 34,786 (La. App. 2 Cir. 6/22/01), 792 So. 2d 832.

A statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule. *Kennedy*, *supra; Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So. 2d 129.

In Louisiana, defamatory words have traditionally been separated into two categories: those that are defamatory *per se* and those that are susceptible of a defamatory meaning. *Kennedy*, *supra*; *Costello*, *supra*. "Words which expressly or implicitly accuse another of criminal conduct . . . are considered defamatory *per se*." *Kennedy*, 05-1418 at p. 5, 935 So. 2d at 675.

In determining whether a given communication is defamatory, the court must determine whether the communication was reasonably capable of

11

conveying the particular meaning or innuendo ascribed to it by the plaintiff and whether that meaning is defamatory in character. *Johnson v. Purpera*, 20-01175 (La. 5/13/21), 320 So. 3d 374. That is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. *Sassone v. Elder*, 626 So. 2d 345 (La. 1993).

As stated by the Louisiana Supreme Court in *Johnson v. Purpera*, 20-01175 at p. 18, 320 So. 3d at 390:

> The challenged words must be construed according to the meaning that will be given them by reasonable individuals of ordinary intelligence and sensitivity, and they must be understood in the context in which they were used and in the manner shown by the circumstances under which they were used. Ultimately, the question posed to the court is whether a particular statement is objectively capable of having a defamatory meaning, considering the statement as a whole, the context in which it was made, and the effect it is reasonably intended to produce in the mind of the average listener.

Citations omitted.

A defamatory word must refer to an ascertained or ascertainable person, and that person must be the plaintiff. *McConathy v. Ungar*, 33,368 (La. App. 2 Cir. 8/23/00), 765 So. 2d 1214, *writ denied*, 00-2678 (La. 11/17/00), 774 So. 2d 982 (citing *Hyatt v. Lindner*, 133 La. 614, 63 So. 241 (1913)). If the word used contains no reflection on a particular individual, no averment or innuendo can make it defamatory as an innuendo cannot make the person certain which was uncertain before. *Id*.

Because the defamation action is personal to the party defamed, this general rule precludes a person from recovering for a defamatory statement made about another, even if the statement indirectly inflicts some injury upon the party seeking recovery. *Johnson v. KTBS*, *Inc.*, 39,022 (La. App. 2

12

Cir. 11/23/04), 889 So. 2d 329, *writ denied*, 04-3192 (La. 3/11/05), 896 So. 2d 68.

There are three types of defamatory statements that are actionable in Louisiana: (1) false defamatory statements of fact; (2) statements of opinion which imply false defamatory facts; and (3) truthful statements which carry a defamatory implication. *Johnson v. Purpera*, *supra*. The third category has been referred to as defamation by implication or innuendo. *Id.* This type of defamation happens "when one publishes *truthful* statements of fact, and those *truthful* facts carry a false, defamatory implication about another." *Fitzgerald v. Tucker*, 98-2313, p. 12 (La. 6/29/99), 737 So. 2d 706, 717. It occurs when a defamatory meaning can be insinuated from an otherwise true statement; however, it is actionable only if the statements regard a private individual and private affairs. *Johnson v. Purpera*, *supra*.

The appellants maintain that DIG presented false statements and communications which led viewers to believe that DR had been the only suspect in the Grissom murders. This was accomplished through the display of newspaper articles that did not always contemporaneously link with the statements made by the person being interviewed as the articles were displayed. The appellants contend the issue was magnified when DIG concealed articles from November of 1989 in which the article headlines mentioned or implied that Carter was a suspect.

The appellants' defamation claims were properly dismissed on the exceptions of no cause of action for several reasons. First, failing to mention Carter's name in reference to the Grissom murders and not displaying newspaper articles concerning Carter being a suspect do not meet the

13

requirements for defamation as the "statement concerning another" element is missing.

Second, even if the Florida investigator's commentary in DIG ("Their case was cold, at that point. Their case was a year old. They didn't have any suspects."), which was played while supporting articles from the *Times* were displayed, could be construed as a statement implying that Carter had never been a suspect in the Grissom murders, it was not a defamatory statement. It is not defamatory to imply that there were no other suspects in a crime. As noted earlier, it is considered defamatory *per se* to expressly or implicitly accuse another of criminal conduct.

The same holds true for when the March 8 article was shown immediately after Julie Grissom's sister-in-law spoke about the discovery of the bodies, as well as when the November 8 and November 10 articles were shown while a former Shreveport resident related how she informed law enforcement in 1990 about DR's possible connection to the Grissom murders.

Third, the final category of defamatory statements involves defamation by implication or innuendo. However, it is actionable only if the statements regard a private individual and *private* affairs. *Johnson v. Purpera*, *supra*. Crime is not a matter of private affairs; rather, it is a matter of public concern. "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of

14

government." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492, 95 S. Ct. 1029, 1045, 43 L. Ed. 2d 328 (1975).

The appellants also contend that ABC knowingly and intentionally concealed from the public that Carter orchestrated the confession. However, it was never stated or implied in DIG that DR discussed his confession to the Grissom murders only with his pastor or that nobody else played a role in obtaining the confession. The confession was mentioned near the end of the program. Again, failing to mention Carter is not defamation.

How DIG presented the investigation of the Grissom murders or DR's confession to those murders could not be reasonably construed as implying that Carter had lied to those who believed that he had been a prime suspect in the Grissom murders or that he had facilitated DR's confession. A reasonable viewer of ordinary intelligence and sensitivity would have considered the program to be about DR and the Gainesville murders, hence its title.

DIG was not an exhaustive treatment of the Grissom murders or even the Gainesville murders. Noted filmmaker Ken Burns was not at the helm directing an in-depth PBS documentary miniseries that was broadcast over several nights. Rather, it was a two-hour program that essentially focused on the Gainesville murders and their aftermath.

KTBS did not defame Carter by airing his interview in conjunction with the broadcast of DIG or by not giving him the opportunity for a second interview to correct what Carter thought may have been omissions or false statements in DIG. Carter would have been using his own words during the

interview, and the decision not to offer a second interview does not even meet the first requirement of a statement for a defamation.

The exceptions of no cause of action were properly granted against the defamation claims.

### Intentional infliction of emotional distress

In order to recover for intentional infliction of emotional distress, a plaintiff must establish: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *White v. Monsanto Co.*, 585 So. 2d 1205 (La. 1991). The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id.*

We first note that a separate cause of action did not arise from any emotional distress that appellants claimed they suffered separate and apart from any element of damages arising from their defamation claim. *See Kelly v. West Cash & Carry Bldg. Materials Store*, 99-0102 (La. App. 4 Cir. 10/20/99), 745 So. 2d 743. The alleged intentional infliction of emotional distress arose from the same facts underlying the defamation claim.

Second, despite appellants' absurd assertion that what ABC did through the DIG program was "outrageous and almost as unspeakable as [DR's] murders," leaving viewers with an inference that Carter was not a

16

suspect in the Grissom murders or that DR confessed of his own volition is not conduct that can be remotely considered extreme and outrageous.

We note that in their opposition to the exceptions of no cause of action and the motions to strike, the plaintiffs admitted that they did not have sufficient evidence to believe that KTBS intended to produce severe mental distress. We also note that the appellants state in their brief that KTBS's actions and inactions *appear* to be intentional infliction of emotional distress.

The exceptions of no cause of action were correctly granted concerning the claim of intentional infliction of emotional distress.

### Business invitee

In support of their claim that KTBS owed Carter a duty of care as a business invitee, the appellants cite *Morales v. Magnolia Chemicals & Solvents, Inc.*, 399 So. 2d 640 (La. App. 4 Cir. 1981), *writ denied*, 401 So. 2d 993 (La. 1981). Following a bench trial, Morales was awarded damages for injuries that he suffered when he was severely burned by sulfuric acid which had been dispensed into his employer's truck at the defendant's plant. Affirming the judgment, the *Morales* court quoted the trial court's written reasons for judgment at length. The trial court had concluded that as a business invitee, Morales had been owed the duty of reasonable and ordinary care, which included the proper discovery of reasonably discoverable conditions on the premises which may have been unreasonably dangerous, and the business either had to correct them or warn the invitee of the danger.

The appellants invite this court to expand the duty owed to business invitees as stated in *Morales* to include a duty of care imposed on KTBS to

17

protect Carter from mental, credibility, or reputational harm resulting from KTBS's broadcasts on April 9, 2021. We decline the invitation.

Appellants contend this is "what the law of Louisiana *should* be." We disagree. KTBS owed no heightened duty of care to Carter when it invited him for an interview or when it did not invite him for another interview to defend himself following the broadcast of DIG.

The exceptions of no cause of action were properly granted as to any business invitee claims.

***Amended and Supplemental Amended Petition***

The appellants argue the trial court erred in denying their motion for leave of court to amend and supplement their amended petition to include factual information that appellants had obtained from La. C.C.P. art. 971 discovery.

They complain that ABC and KTBS only produced some of the items that ABC and KTBS committed to produce after the appellants had filed a motion for art. 971 discovery. They argue that the trial court should have granted the motion to amend and supplement their petition so they could preserve their art. 971 discovery claims.

La. C.C.P. art. 971(D) provides that discovery is stayed upon the filing of notice of a special motion to strike. Further, amendment to a pleading is not permitted when it would be a vain and useless act, such as after the grant of a peremptory exception. *Bucks v. DirecTECH Southwest*, 52,474 (La. App. 2 Cir. 2/27/19), 266 So. 3d 467, *writ denied*, 19-00701 (La. 9/6/19), 278 So. 3d 970. The exception of no cause of action is a peremptory exception. La. C.C.P. art. 927.

18

The trial court did not abuse its discretion in denying the motion.

***Special motion to strike***

The legislature enacted La. C.C.P. art. 971 as a procedural device to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. *Quinlan v. Sugar-Gold*, 53,348 (La. App. 2 Cir. 3/11/20), 293 So. 3d 722, *writ denied*, 20-00744 (La. 10/6/20), 302 So. 3d 536.

La. C.C.P. art. 971 states in part:

A. (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.
(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
. . . . .
B. In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs.
. . . . .
F. As used in this Article, the following terms shall have the meanings ascribed to them below, unless the context clearly indicates otherwise:
(1) "Act in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue" includes but is not limited to:
. . . . .
(c) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.
(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Section 2 of Act 734 of 1999, which enacted art. 971, stated that the Louisiana Legislature had found a "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances." The lawsuits targeted by art. 971 are referred to as strategic lawsuits against public participation, or SLAPP. *Hatfield v. Herring*, 54,048 (La. App. 2 Cir. 8/11/21), 326 So. 3d 944, *writ denied*, 21-01377 (La. 12/7/21), 328 So. 3d 424.

In *Wainwright v. Tyler*, 52,083, pp. 16-17 (La. App. 2 Cir. 6/27/18), 253 So. 3d 203, 217, this court discussed the burden of proof on the art. 971 motion:

> Our appellate courts interpret this statute as requiring a two-part, burden-shifting analysis. In cases where right of petition and free speech activities form the basis of the claims, the mover must first establish that the cause of action against him arises from an act by him in the exercise of his right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue. If the mover makes a *prima facie* showing that his comments were constitutionally protected and in connection with a public issue, the burden shifts to the plaintiff to demonstrate a probability of success on the claim. In cases where more than one claim is alleged in the petition, the courts examine the probability of success of each claim individually. If the plaintiff can demonstrate a probability of success on any of his claims, then the special motion to strike must fail.

Citations omitted.

We conclude that the trial court erred in finding that the special motions to strike became moot upon the dismissal of appellants' claims. While the granting of the exceptions of no cause of action resolved appellants' claims, it did not resolve the issues raised by the special motions to strike.

20

In *Roper v. City of Baton Rouge/Parish of East Baton Rouge*, 2016-1025 (La. App. 1 Cir. 3/15/18), 244 So. 3d 450, *writ denied*, 18-0854 (La. 9/28/18), 252 So. 3d 926, the trial court determined that the plaintiff's request for a writ of mandamus was moot because she had been provided with all non-exempt records sought in her public records request. However, the court still awarded attorney fees against one defendant. On appeal, the defendants argued the award should be reversed because the claim for a writ of mandamus was moot by the time of trial. The appellate court concluded that the mootness of the mandamus claim did not preclude an award of attorney fees.

Turning now to the merits of the special motions to strike, we determine that ABC and KTBS made a *prima facie* showing that the content of DIG was an act in furtherance of their right to free speech and in connection with a public issue. As stated earlier, the commission of a crime, the prosecution, and the judicial proceedings arising from the prosecution are matters of legitimate public concern.

The burden then shifts to the appellants to demonstrate a probability of success on their claims. They are unable to do this as their claims cannot withstand the exceptions of no cause of action. Accordingly, the trial court should have granted ABC's and KTBS's special motions to strike and considered the assessment of costs and the award of attorney fees that are allowed under art. 971.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment insofar as it granted the exceptions of no cause of action and dismissed Carter's and

21

Dream Creations' claims.  We reverse the judgment insofar as it denied

ABC's and KTBS's special motions to strike as moot.  This matter is

remanded to the trial court for a determination of costs to be assessed and

attorney fees to be awarded to ABC and KTBS for successfully establishing

their special motions to strike.  Costs of the appeal are assessed against

Carter and Dream Creations.

**AFFIRMED IN PART, REVERSED IN PART, AND**

**REMANDED**.