Judgment rendered August 27, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,416-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

CLAUDIA PAYNE                                        Plaintiff-Appellant

versus

AARON LAWRENCE, THE                                 Defendants-Appellees
LAWRENCE LAW FIRM, LLC &
CHRISTOPHER GILBERT

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 63,785

Honorable Jenifer Ward Clason, Judge

* * * * *

THE BURRELL LAW FIRM, LLC                 Counsel for Appellant
By: Dwayne A. Burrell
    Allen Burrell

BREITHAUPT DUBOS & WOLLESON               Counsel for Appellee,
By: Patrick S. Wolleson                   Christopher Gilbert

GIBSON LAW PARTNERS, LLC                  Counsel for Appellees,
By: James H. Gibson                       Aaron Lawrence and The
                                          Lawrence Law Firm,
                                          LLC

LAW OFFICES OF RUSSELL A.
WOODARD, JR., LLC
By: Russell A. Woodard, Jr.

* * * * *

Before STEPHENS, THOMPSON, and MARCOTTE, JJ.

**THOMPSON, J.**

Christopher Gilbert and some friends were on a dock at a waterfront bar and restaurant in Lincoln Parish, when he nearly drowned after a friend pushed him into the water during horseplay. While Gilbert was hospitalized his somewhat estranged mother retained an attorney, Claudia Payne, who immediately undertook aggressive efforts on her social media accounts to create publicity about the incident and promote her involvement. Payne promoted a narrative suggesting criminal activity on the part of the friend who pushed Gilbert into the water and identified race as a potential factor in the incident. Payne solicited broader media coverage and participated in a resulting interview on a local television station, repeating her carefully crafted narrative of race-based motives and exaggerating circumstances regarding the already serious incident. Upon his discharge from the hospital, Gilbert determined that he disagreed with Payne's theory of his case and ended her representation of him. Payne's activist approach to the incident and assertions she represented Gilbert after her termination continued, however. Gilbert's new attorney then issued a statement that corrected the narrative put forth by Payne, to which Payne filed a lawsuit claiming defamation against Gilbert and his new attorney. In response, Gilbert and his attorney filed a special motion to strike, pursuant to Louisiana's anti-SLAPP (strategic lawsuits against public participation) statute, La. C.C.P. art. 971, which protects free speech in connection with a public issue, arguing that their press release regarding the drowning and resulting publicity was true. The trial court granted the special motion to strike, dismissed Payne's claims, and awarded attorney fees to Gilbert and his

attorney.  Payne now appeals the trial court's ruling granting the special motion to strike.  For the following reasons, we affirm the trial court's ruling and increase the attorney fee award to account for this appeal.

**FACTS AND PROCEDURAL HISTORY**

On April 14, 2024, Christopher Gilbert ("Gilbert"), a 26-year-old black male, went to Rhett's Tails and Shells, a bar and restaurant located on Lake D'Arbonne in Farmerville, Louisiana, with a group of friends from his workplace.  Gilbert was a recent graduate of Louisiana Tech University; he earned his master's degree in biology and had plans to attend medical school.  Gilbert and his friends were drinking on the dock of the restaurant.  When they began horseplaying around, Gilbert's friend Cassidy playfully pushed him off the dock and into the lake.  Unfortunately, the water was deeper than expected and Gilbert sank to the bottom due to his limited swimming ability.

When he did not immediately surface, Gilbert's friends believed he was pulling a prank.  They quickly realized he was not joking, and the friends frantically went into the water to find him.  Despite their efforts, Gilbert's friends could not find him.  Another patron of the restaurant dove in the lake, found Gilbert at the bottom, and pulled him to the surface.  The record indicates it was estimated Gilbert was underwater for approximately 3-5 minutes.  Gilbert was resuscitated with CPR on the dock, and he was airlifted to Ochsner/LSU in Shreveport.  After 3 weeks in the hospital, including time spent in the ICU, Gilbert fortunately made a full recovery and was ultimately discharged on May 5, 2024.

2

The day after the incident, on April 15, 2024, Gilbert's friends visited him in the hospital in Shreveport. There, they encountered Gilbert's biological mother, Yolanda George, who, unbeknownst to them, was somewhat estranged from Gilbert. The record shows Yolanda held a hostile racial animus toward Gilbert's diverse group of friends. While speaking with Yolanda, Gilbert's friend Cassidy mentioned that she was the one who had playfully pushed him into the lake. Yolanda began speaking out on her personal social media, claiming Cassidy should be arrested because she knew Gilbert could not swim when she pushed him into the lake. Yolanda posted on Facebook seeking an "activist attorney" to obtain justice for her son. The Facebook page of Claudia Payne ("Payne"), an attorney officed in Ruston, Louisiana, was tagged in Yolanda's request by multiple individuals. Payne was the one who then initiated connected with Yolanda and accepted her theory of the case without further inquiry and did not contact any witnesses to determine what may actually have occurred leading to Gilbert's injury. At this time, Gilbert was sedated on a ventilator in the ICU at Ochsner/LSU hospital.

The next day, Payne contacted the Farmerville Police Department and spoke with Detective Lamar Guillot, who prepared a report detailing his conversation with Payne. The report states that Payne asked if Cassidy had been arrested and demanded that she be arrested immediately. Payne informed Det. Guillot of a press release that she was preparing, in which she intended to announce that Cassidy had been arrested, and that Farmerville Police therefore needed to locate Cassidy and arrest her immediately. Det. Guillot explained he did not have probable cause to make an arrest, and he

3

would not be strong-armed into making an arrest. Det. Guillot's report also noted that one hour after speaking with him, Payne started posting "reckless lies on Facebook which in turn produces (*sic*) a social media firestorm."

The "press release" Payne mentioned to Det. Guillot was in fact a Facebook post published by Payne to her followers – the first of four posts in rapid succession relating to Gilbert's accident. In addition to publishing photos of Gilbert in the hospital on a ventilator, Payne also posted that Cassidy is "white" (in reality, Cassidy is Native American); Gilbert was underwater for 20 minutes; no one from the friend group jumped into the lake to try to find Gilbert; and stated, "there is no positive opinion about his recovery." These wildly false assertions and allegations were either completely unverified or were knowingly false when made. The post also called for Cassidy's arrest and hypothesized, apparently to create racial tension and division, that if a white woman had been pushed into a lake by a black male, an arrest would certainly have been made. Apparently attempting to generate publicity about an incident she had still not investigated, and to create publicity and raise her own social media and public persona, Payne also tagged KSLA News' Facebook account to her post. Payne's first Facebook post was published less than 24 hours after the incident, during a time in which Payne had not spoken to a single eyewitness or to Gilbert to verify her incendiary allegations. The record shows that Payne's Facebook post was shared 1700+ times, reacted to 1200+ times, and commented upon 570+ times. If Payne's objective was to generate publicity without a concern for truthfulness or accuracy, her efforts met with immediate success.

4

Meanwhile, Yolanda, Gilbert's biological mother, was also posting on her personal Facebook page, characterizing Gilbert as a victim of systemic racism. In truth, however, Gilbert and Yolanda were mostly estranged from each other and while Gilbert was incapacitated, Yolanda enjoyed no legal authority or power of attorney to act on his behalf. Payne apparently accepted without question that Yolanda had some legal authority to speak and act for her adult son, Gilbert, and in conjunction with her undertook efforts and collaborated on and promoted a media campaign focused on a civil rights agenda with Gilbert's case. Yolanda instantly injected herself into Gilbert's unfortunate situation and, as Payne cloaked herself as an activist, instigating, fanning, and then capitalizing on a theory of racial injustice and intrigue.

After putting into motion her agenda days earlier, it was not until April 19, 2024, when Payne had her first contact with Gilbert. Gilbert had no independent recollection of the drowning incident. He was still in the ICU, on a ventilator, and heavily medicated with powerful narcotics and other drugs including fentanyl, ketamine, morphine, dilaudid, and oxycodone.

Over a week after their initial meeting, on April 29, 2024, Payne presented her contingency fee agreement to Gilbert for a premises liability case against Rhett's Tails and Shells, the restaurant whose dock Gilbert was on at the time of the incident. Payne presented this fee agreement through Yolanda. Gilbert remained in the ICU and heavily medicated. Payne was not present when Yolanda presented the agreement to Gilbert for his signature and cannot testify about what, if anything, Yolanda said to Gilbert

regarding the agreement or his understanding of it. The agreement did not expressly authorize a civil rights campaign, publicizing the ordeal, or pursuing an arrest of Cassidy. These efforts were completely conceived and implemented by Payne without knowledge or approval by Gilbert, and appear to, at least in part, have had the intention of raising awareness of Payne's law practice and profile as an activist in the community and nation as opposed to advancing Gilbert's stated desires and best interest.[1]

The day after the contingency fee agreement for the premises liability case was signed, Payne gave a recorded interview to KSLA News. Payne was asked about the incident and the friends' horseplay, and she responded: "In the legal field we characterize things the way we see fit. Of course they are saying horseplay. We are saying that it was a criminal intentional push in the lake."

---

[1] Christopher Gilbert's affidavit, Section 22, provides in pertinent part:

From my own investigation, I realized that, to further the interest of my estranged mother (Yolanda George) in pursuing a claim on her behalf, Claudia Payne had obviously adopted her racial bias and hostility toward my diverse group of friends. Ms. Payne injected a racial motive into my April 14th incident without my permission, publicly accusing my friends in local and national media interviews, through her own social media accounts, and through aggressive complaints to law enforcement, of committing a racially motived crime against me, which is untrue. I also learned that Claudia Payne had not spoken to any of the eyewitnesses. After researching Claudia Payne's accusations about my friends now spread across the internet, after seeing a photographs of myself while in ICU and hooked up to a ventilator which was released by to the media by Claudia Payne without my permission, and after seeing that Claudia Payne had publicly stated to the media without my permission that I was brain-dead or brain damaged, I knew I had to do something to correct the false narrative. Due to Claudia Payne's media campaign, my friends were being publicly labeled as racists, resulting in harassment and even death threats on their social media messaging accounts. My planned medical career was in jeopardy due to Claudia Payne releasing a photograph and depicting me in the media as brain-dead — which was totally untrue and without any medical basis.

On May 5, 2024, Gilbert was discharged from the hospital. Payne did not communicate with Gilbert on that date. Payne continued her fervent internet activity, including "liking" her co-counsel's Instagram post that Gilbert suffered "brain damage."

The very next day, on May 6, 2024, multiple articles were posted on various websites including Bossip.com and the New York Post website, with headlines indicating a hate crime had occurred and alleging that Gilbert suffered brain damage. MSN, Yahoo News, and Vibe published articles indicating Payne's description of the incident as "racially motivated."

That same day, Gilbert ended Payne's representation of him as his attorney and contacted his new attorney, Aaron Lawrence ("Lawrence"). Despite having her representation of Gilbert terminated, Payne was undeterred and continued her campaign and contacted "The Breakfast Club: The World's Most Dangerous Morning Radio Show" to discuss the incident, shockingly still claiming to be Gilbert's attorney, which she knew at the time to be false. Meanwhile, Gilbert created his own GoFundMe page to assist with his significant medical bills arising from his treatment and lengthy stay in the hospital and ICU. On his GoFundMe page, Gilbert described the incident as an "accident." The record shows that his mother, Yolanda, began to send hurtful text messages to Gilbert, revealing her hopes to monetize his incident for herself, and shaming him for going against her wishes. The apparent team of Payne and Yolanda were undeterred in promoting their narrative of events for their own benefit, in direct contravention of Gilbert's desires and truthful firsthand description of the events.

On May 11, 2024, Gilbert's new attorney and longtime friend, Lawrence, issued a press release intended to correct the narrative of the incident that Payne had orchestrated via her social media posts and her interviews with the local news media, which had now apparently achieved their intended result and received national attention, bringing Payne prominently along with it. The press release was entitled "RE: Official Clarification & Statement on Behalf of Chris Gilbert." The press release provided, in pertinent part:

> Since the accident, an attorney by the name of Claudia Payne, through what we believe was improper solicitation, has represented Mr. Gilbert without his authorization or full consent. Miss Payne has made a series of inflammatory and factually incorrect statements to the press, alleging that the incident was a racially motivated hate crime and that the friend who pushed Mr. Gilbert should be charged with attempted negligent homicide – a charge that doesn't exist within Louisiana legal statutes. Miss Payne has continued to propagate this narrative despite the lack of evidence and contrary information provided by law enforcement investigations and medical staff. Her claims that Mr. Gilbert was submerged for 20 minutes, was at some point brain dead, and suffered organ failure are not only grossly exaggerated but also medically unsubstantiated. Furthermore, the release of private photos of Mr. Gilbert during his hospitalization and the ongoing assertion of a premeditated plan by his coworkers to cause him harm are wholly without merit and are considered by Mr. Gilbert and his current counsel to be both offensive and legally concerning. Mr. Gilbert has expressed that he has never authorized Ms. Payne to make such statements, nor has he authorized the release of his hospital photos. He unequivocally denies all the claims made by Claudia Payne and wishes to make clear that the events of that fateful day were an accident and not the result of malicious intent.

That evening, Payne posted a response to the press release on her Facebook page, claiming that Gilbert had been influenced to accept a story that ignored inequities that persist in the system, and that this was "bigger than Mr. Gilbert." Payne continued to appear unwilling or unable to accept a

narrative based on truth, rather than on her hastily and racially charged theory of intentional injury and exaggerated permanent injuries of Gilbert.

On May 14, 2024, the nationally syndicated podcast The Breakfast Club discredited and mocked Gilbert using Payne's false narrative, stating he was with his "all white" friends who pushed him into the lake knowing he could not swim and none of them tried to help him. They stated that Gilbert was brain dead and underwater for 10 minutes. They called his friends "terrible friends" and referred to Gilbert as "AquaMan." Unfortunately for Gilbert, this broadcasted attack had its origins in Payne's false assertions and publicity-seeking allegations, rather than efforts undertaken by capable legal counsel for a client's best interest or truth.

On May 15, 2024, Payne again posted on Facebook directing her followers to The Breakfast Club podcast that discussed Gilbert. In her post, Payne also mentioned Lawrence, calling him a "bottom-tier" attorney and "a joke." Lawrence, an honorably discharged United States Marine with active conflict deployments, appears to have exercised great restraint by not pursuing his own defamation claims against Payne for such reckless and harmful comments.

In contrast, on May 20, 2024, 15 days after Gilbert was discharged from the hospital, Payne filed a defamation lawsuit against him and Lawrence alleging the Press Release they published countering her narrative of the incident contained four defamatory statements:

1. Defendants knew Payne never made claims that Gilbert was "brain dead."

2. Defendants falsely implied that Payne alluded to this being a premeditated racially motivated hate crime.

9

3. Gilbert knew that Payne had full authority to represent him for the April 14, 2024 incident.

4. Defendants falsely implied that Payne preyed on Gilbert and represented him without his consent or through improper solicitation.

Lawrence and Gilbert jointly moved to strike and dismiss Payne's claims under La. C.C.P. art. 971. Gilbert and Lawrence included supporting affidavits with their motion from Lawrence, Gilbert, Gilbert's six friends present during the incident, a legal nursing expert, and a reputational harm expert. Gilbert and Lawrence also included multiple exhibits, authenticated with the affidavits: news articles, the Farmerville Police Report, Payne's contingency fee contract, Payne's Facebook posts, Payne's Petition for Signatures Demanding Arrest and Prosecution, and text messages. Lawrence and Gilbert also prayed for attorney fees which are authorized under La. C.C.P. art. 971(B) and submitted affidavits and billing statements from their attorneys.

After a hearing, the trial court dismissed Payne's lawsuit. The trial court determined the statements in Lawrence's press release were true, Payne produced no evidence of malice, and Payne suffered no damages. The trial court also granted in part and denied in part Gilbert's motion for attorney fees and costs. The trial court fixed Gilbert's attorney fees at $24,776.70, and Lawrence's at $26,991.

Payne now appeals the trial court's judgment dismissing her claims and the award of attorney fees to Gilbert and Lawrence.

## DISCUSSION

The right to free speech is guaranteed in the constitutions of both the United States and Louisiana. The First Amendment to the United States

10

Constitution provides that "Congress shall make no law … abridging the freedom of speech, or the press[.]" The Louisiana Constitution art. 1, § 7 states that "[n]o law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom."

In 1999, the Louisiana legislature found that "there had been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances." La. C.C.P. art. 971. These lawsuits are referred to as strategic lawsuits against public participation (or "SLAPP"). The legislature enacted Article 971 intending to encourage continued participation in matters of public significance and to prevent participation from being chilled through an abuse of judicial process. *Wainwright v. Tyler*, 52,083 (La. App. 2 Cir. 6/27/18), 253 So. 3d 203; *Lee v. Pennington*, 02-0381 (La. App. 4 Cir. 10/16/02), 830 So. 2d 1037, *writ denied*, 02-2790 (La. 1/24/03), 836 So. 2d 52. The legislature enacted Article 971 as a procedural device to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. *Quinlan v. Sugar-Gold*, 53,348 (La. App. 2 Cir. 3/11/20), 293 So. 3d 722, *writ denied*, 20-00744 (La. 10/6/20), 302 So. 3d 536. A special motion to strike is a "specialized defense motion akin to a motion for summary judgment." *Lamz v. Wells*, 05-1497 (La. App. 1 Cir. 6/9/06), 938 So. 2d 792.

La. C.C.P. Art. 971 provides in pertinent part:

(A)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free

11

speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3) If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding.

B. In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs.

Article 971 further authorizes a stay on all discovery proceedings in the action upon the filing of the special motion, and the stay remains in place until notice of entry of the order ruling on the motion. La. C.C.P. art. 971(D). Finally, Article 971 defines an "[a]ct in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue" to include "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." La. C.C.P. art. 971(F)(1)(c).

Louisiana jurisprudence interprets Article 971 as requiring a two-part, burden-shifting analysis. *Wainwright*, *supra*. The mover must first establish that the claims against him arise from an act by him in the exercise of his right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue. *Id.* If the mover makes a *prima facie* showing that his comments were constitutionally protected and in connection with a public issue, the burden then shifts to the plaintiff to demonstrate a probability of success on the claim as the second part of the

analysis. In cases where more than one claim is alleged in the petition, the courts examine the probability of success of each claim individually. If the plaintiff can demonstrate a probability of success on any of his claims, then the special motion to strike must fail. *Shelton v. Pavon*, 17-0482 (La. 10/18/17), 236 So. 3d 1233.

The granting of a special motion to strike presents a question of law. Questions of law are reviewed *de novo*, with the judgment rendered on the record, without deference to the legal conclusions of the tribunals below. *Quinlan*, *supra*.

## Assignments of Error

Payne assert the following five assignments of error (verbatim):

Assignment of Error Number 1: The trial court erred as a matter of law in designating Claudia Payne a limited purpose public figure based solely on her social media presence and initial public advocacy, where the defamatory statements arose from a private legal dispute.

Assignment of Error Number 2: The trial court erred in concluding that Plaintiff failed to meet her burden under Article 971, despite her prima facie showing that the challenged statements were defamatory per se and made with at least negligence, if not actual malice.

Assignment of Error Number 3: The trial court erred by improperly weighing evidence, resolving factual disputes, and assessing credibility – including disputes over Gilbert's sedation status, the legitimacy of Payne's attorney-client relationship, and reputational harm – at the motion to strike stage.

Assignment of Error Number 4: The trial court erred in failing to analyze or consider the "predatory attorney" statement, despite its inclusion in the Petition and its clear defamatory implication.

Assignment of Error Number 5: The trial court abused its discretion by awarding excessive attorney fees and costs unsupported by contemporaneous billing records or proof of reasonableness, in violation of La. C.C.P. art. 971 (B) and established jurisprudence requiring strict construction of fee-shifting statutes.

13

The first four assignments of error are all related to Payne's claims of defamation and the application of Article 971; therefore, we will address them contemporaneously below.

**<u>Defamation and Special Motion to Strike</u>**

Payne argues that the trial court erred in designating her as a limited-purpose public figure by erroneously linking her general social media presence and initial advocacy to the statements Gilbert and Lawrence made in their press release. Payne argues that the defamatory statements did not stem from any public controversy but involved private accusations regarding legal representation and client authorization unrelated to the public incident. Payne also argues that the trial court improperly relied on unsupported factual conclusions about her visibility and the number of followers on social media, specifically the 70,000 figure she provided in her petition. Payne asserts that her follower count she listed was an "aggregate from multiple platforms, not solely tied to the posts (on Facebook) at issue." Payne argues that the record established she acted on behalf of her client with authorization and did not seek to become a public figure.

Payne further argues that even if she were properly deemed a public figure, the trial court erred by weighing credibility and determining actual malice at the motion to strike stage. She asserts that by weighing evidence, including affidavits and medical records, the trial court improperly made factual findings prematurely. Payne also asserts Gilbert and Lawrence's statements that Payne was a "predatory attorney"[2] engaged in improper

---

[2]     The record shows that Rhett's Tails and Shells, a non-party to this lawsuit, made its own Facebook post identifying Payne as a "predatory attorney." The record does not establish that Gilbert or Lawrence referred to Payne as a "predatory attorney."

14

solicitation, that she lacked common sense, and represented Gilbert without authority, are examples of defamation per se.

Defamation is a tort that involves the invasion of a person's interest in his or her reputation and good name. *Sassone v. Elder*, 626 So. 2d 345 (La. 1993); *Wainwright, supra.* A statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community or to deter others from associating or dealing with the person or otherwise exposes the person to contempt or ridicule. *Kennedy v. Sheriff of East Baton Rouge,* 05-1418 (La. 7/10/06), 935 So. 2d 669; *Wainwright, supra*.

There are four elements necessary to establish a claim for defamation: 1) a false or defamatory statement concerning another, 2) an unprivileged publication to a third party, 3) fault (negligence or greater), and 4) resulting injury. La. C.C. art. 2315; *Kennedy, supra*; *Wainwright, supra.* If even one of the required elements of the tort is lacking, the cause of action fails. *Wainwright, supra; Quinlan, supra.* The fault requirement is malice, actual or implied. *Wainwright, supra.* Actual malice is generally established by showing that the defendant either knew that the statement was false or acted with reckless disregard for the truth. *Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So. 2d 129.

In determining the standard of liability in defamation claims, the Louisiana Supreme Court makes a distinction between plaintiffs who are public officials or public figures and private individuals. *Kennedy, supra.* In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), the United States Supreme Court found that the First

Amendment prohibits a public official from recovering damages arising from a defamatory falsehood published in relation to his or her official conduct, unless the public official proves that statement was made with "actual malice." This protection was granted to speech discussing public officials because defamation would have a chilling effect on constitutionally valuable speech. *Kennedy, supra.* The *New York Times* decision imposed the requirement for a high degree of fault in defamation actions brought by public officials and shifted the heightened burden of proof of fault to the public official. *Kennedy, supra.*

The case of *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967), extended the standard of liability to include public figures, i.e. non-public officials who are intimately involved in the resolution of important public questions or who, by reason of their fame, shape events in areas of concern to society at large. A person may become a public figure because they have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). An individual who voluntarily injects himself or is drawn into a particular controversy becomes a public figure for this limited range of issues because they have invited attention and comment and assume special prominence in the resolution of public questions. *Gertz, supra; Wainwright, supra.*

The aggressive and constant social media presence that Payne has curated and fueled for herself and her law practice was intended to elevate her name recognition and engagement with the general public. Payne has

actively engaged in serving as her own paparazzo, cataloging and publicizing every aspect of her legal practice and asserted prowess and successes. Payne is not communicating behind a paywall, on a limited platform, or with only subscribers or clients reading blogs or articles on her law firm website. To the contrary, Payne is consistently generating and posting messages to anyone with a computer or smartphone and access to any of the massive social media platforms. Payne has diligently worked to promote her presence and engagement as a prominent member of the public discussing public topics. Payne has sought to establish a reputation for herself as a zealous activist and nurtured and expanded her audience to include, engage, and interact with thousands of individuals.

We find the trial court did not err in concluding that Payne is a limited purpose public figure. In her roles as an activist, as an attorney, and as an activist attorney, Payne regularly helped manufacture and then injected herself into a public controversy. Payne created and then fanned the controversy surrounding Gilbert's drowning through her extensive social media presence, which then received the sought-after attention of multiple local and national news sources. By design, Payne became a public figure by thrusting herself into the forefront of a public controversy and inviting public comments. Payne's defamation claims are exclusively tied to Gilbert and Lawrence's *response* to the topic she elevated to a matter of public concern.

Payne, as a public figure, must establish actual malice in order for her defamation action to succeed. The actual malice standard is not met merely through showing ill will or "malice" in the ordinary sense of the word.

Actual malice may not be inferred from evidence of personal spite, an intention to injure, or a bad motive. *Tarpley v. Colfax Chronicle*, 94-2919 (La. 2/17/95), 650 So. 2d 738. Actual malice must be proven with convincing clarity. *Kennedy, supra.*

Payne provided no evidence that Lawrence and Gilbert were highly aware that the statements in their press release were false, or that there was proof with convincing clarity of actual malice. Payne offered no evidence to support a factual finding that Gilbert acted out of malice in seeking new legal counsel to represent him and correct the false media narrative created by Payne surrounding his drowning accident. Lawrence clearly did not act out of malice by conducting his own investigation and research on Gilbert's behalf to correct the false narrative and issue a public statement.

The trial court correctly articulated its reasons for its ruling, which included that the Press Release contained the truth, there was no malice shown by Gilbert or Lawrence in issuing the Press Release, and Payne suffered no damages. Payne had no factual basis or informed consent from Gilbert to craft a racially charged narrative around his drowning accident and publish her thoughts on her vast social media platforms. Payne did not have any evidence of a criminal act on the part of Gilbert's friends at the time she published her statements but made and repeated those statements frequently. Payne promoted race-based criminal accusations on her social media platform and sought out media opportunities to pressure law enforcement into making an arrest to support her narrative. Payne's professional judgment was influenced by a desire for self-promotion as an "activist attorney" fighting systemic racism, even though racism did not

18

apply to Gilbert's accident or its investigation, which objectively should have been readily apparent to Payne. We acknowledge that Payne proceeded with the understanding of representing "the family" on behalf of Gilbert; however, Payne had professional duties to all her prospective clients, most importantly to Gilbert.

Accordingly, because Payne has failed to prove actual malice with regard to the statements made by the defendants in the Press Release, she did not establish a probability of success on his claim for defamation. These four assignments of error are without merit, and the trial court was correct in granting defendants' special motion to strike Payne's petition.

**Attorney Fees**

Payne's fifth assignment of error relates to the award of attorney fees. As noted herein, the trial court, after a hearing, fixed Gilbert's attorney fees at $24,776.70, and Lawrence's at $26,991. On appeal, Payne argues that the attorney fee award is excessive. In response, Gilbert and Lawrence assert that the trial court's award of attorney fees should be affirmed and request an increase in the attorney fee award associated with this appeal in the amount of $10,000, plus all costs.

In any action subject to La. C.C.P. art. 971(A), a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs. La. C.C.P. art. 971(B); *Quinlan*, *supra*. As a general rule, attorney fees are not allowed in Louisiana unless they are authorized by statute or provided for by contract. *State, Dept. of Transp. & Dev. v. Wagner*, 10-0050 (La. 5/28/10), 38 So. 3d 240; *Quinlan*, *supra*.

This court has held that the general rule regarding additional attorney fees for work done on appeal is that an increase in attorney fees is usually allowed where a party was awarded attorney fees by the trial court and is forced to and successfully defends an appeal. In *Quinlan*, *supra*, this court found that where a plaintiff appealed the trial court's grant of the defendant's special motion to strike pursuant to La. C.C.P. art. 971, the defendant was entitled to an increase of attorney fees for the work done on appeal when defendant prevailed.

Here, Payne was unsuccessful in obtaining relief on appeal, and the appeal necessitated substantial additional work by counsel for the defendants associated with review of the transcript, drafting of memoranda, and traveling to and presenting oral arguments, all of which have their genesis in Article 971. The trial court meticulously considered the issue of and amount in awarding attorney fees and was not manifestly erroneous in reaching its conclusions on either. As such, Payne's fifth assignment of error is likewise without merit, and pursuant to the mandatory attorney fee language in La. C.C.P. art. 971(B), we find Gilbert and Lawrence are entitled to an increase in attorney fees for this appeal. We find that the total requested amount of $10,000 plus all costs is a reasonable attorney fee award for defendants for the necessary work on appeal by their respective counsel, and award additional attorney fees of $5,000.00 each to Gilbert and Lawrence.

## CONCLUSION

The trial court's judgment dismissing Payne's claims with prejudice is affirmed. The trial court's attorney fee award is increased by the amount of $10,000, for the necessary work on appeal by appellees' respective counsel,

awarding $5,000 each to Gilbert and Lawrence.  Costs of this appeal are assessed to appellant, Claudia Payne.

**AFFIRMED.**